Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

|  |  |  |
|---|---|---|
| CAMERON LACROIX | ) | Case No. ___25-cv-13452-MPK___ |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | Jury Trial: *(check one)'* **(X)** Yes' No |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | |
| *please write "see attached" in the space and attach an additional* | ) | |
| *page with the full list of names.)* | ) | |
| -v- | ) | |
| BRETT LEATHERMAN, TED E. DOCKS, et. al. | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued. If the* | ) | |
| *names of all the defendants cannot fit in the space above, please* | ) | |
| *write "see attached" in the space and attach an additional page* | ) | |
| *with the full list of names.)* | ) | |

## SECOND AMENDED COMPLAINT FOR A CIVIL CASE

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | CAMERON LACROIX |
| Job or Title | Pro Se Litigant |
| Street Address City | PO Box 620144, Newton |
| and County State | Middlesex, MA |
| and Zip Code | 02462 |
| Telephone Number | 617-539-6662 |
| E-mail Address | cameronlacroix@proton.me |

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

**Defendant No. 1**

| | |
|---|---|
| Name | <u>BRETT LEATHERMAN</u> |
| Job or Title | <u>Assistant Director of FBI Cyber Division</u> |
| Street Address City | <u>935 Pennsylvania Ave NW, Washington</u> |
| and County State | <u>District of Columbia</u> |
| and Zip Code | <u>20535</u> |
| Telephone Number | <u>202-324-3000</u> |
| E-mail Address | <u>UNKNOWN</u> |

**Defendant No. 2**

| | |
|---|---|
| Name | <u>TED E. DOCKS</u> |
| Job or Title *(if known)* | <u>Special Agent in Charge of FBI Boston</u> |
| Street Address City | <u>201 Maple St, Chelsea</u> |
| and County State | <u>Suffolk, MA</u> |
| and Zip Code | <u>02150</u> |
| Telephone Number | <u>857-386-2000</u> |
| E-mail Address | UNKNOWN |

**Defendant No. 3**

| | |
|---|---|
| Name | KIMBERLY MILKA |
| Job or Title *(if known)* | <u>Assistant Special Agent in Charge of FBI Boston</u> |
| Street Address City | <u>201 Maple St, Chelsea</u> |
| and County State | <u>Suffolk, MA</u> |
| and Zip Code | <u>02150</u> |
| Telephone Number | <u>857-386-2000</u> |
| E-mail Address | UNKNOWN |

**Defendant No. 4**

| | |
|---|---|
| Name | ANDREW BAILEY |
| Job or Title *(if known)* | <u>Co-Deputy Director, FBI</u> |

| | |
|---|---|
| Street Address City | 935 Pennsylvania Ave NW, Washington |
| and County State | District of Columbia |
| and Zip Code | 20535 |
| Telephone Number | 202-324-3000 |
| E-mail Address | UNKNOWN |

**Defendant No. 5**

| | |
|---|---|
| Name | UNKNOWN DEFENDANT AGENTS |
| Job or Title *(if known)* | UNKNOWN |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 6**

| | |
|---|---|
| Name | UNDERCOVER AGENT 1 ("UCE-1") aka B.M. |
| Job or Title *(if known)* | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 7**

| | |
|---|---|
| Name | UNNAMED DEFENDANT AGENTS. |
| Job or Title *(if known)* | UNKNOWN |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |

**Defendant No. 8**

| | |
|---|---|
| Name | AGENT-1 (COUNT 7) |
| Job or Title *(if known)* | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 9**

| | |
|---|---|
| Name | AGENT-2 (COUNT 7) |
| Job or Title *(if known)* | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 10**

| | |
|---|---|
| Name | AGENT-3 (COUNT 7) |
| Job or Title *(if known)* | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 11**

| | |
|---|---|
| Name | AGENT-4 (COUNT 8) |
| Job or Title *(if known)* | Special Agent |

| | |
|---|---|
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 12**

| | |
|---|---|
| Name | AGENT-5 (COUNT 8) |
| Job or Title *(if known)* | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 13**

| | |
|---|---|
| Name | UNDERCOVER AGENT 2 ("UCE-2") aka JOE. |
| Job or Title *(if known)* | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 14**

| | |
|---|---|
| Name | UNDERCOVER AGENT 3 ("UCE-3") aka R.M. |
| Job or Title *(if known)* | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |

E-mail Address                UNKNOWN

**Defendant No. 15**

Name                          DAVID G. NANZ
Job or Title *(if known)*     <u>Assistant Director of Operational Technology Division</u>

Street Address City           <u>935 Pennsylvania Ave NW, Washington</u>

and County State              <u>District of Columbia</u>

and Zip Code                  <u>20535</u>

Telephone Number              <u>202-324-3000</u>

E-mail Address                UNKNOWN

**Defendant No. 16**

Name                          UNDERCOVER EMPLOYEE 4 ("UCE-4") aka Philippe
Job or Title *(if known)*     <u>Special Agent</u>

Street Address City           <u>1 Justice Way, Dallas</u>

and County State              <u>Texas</u>

and Zip Code                  <u>75220</u>

Telephone Number              <u>UNKNOWN</u>

E-mail Address                UNKNOWN

---

Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

---

## II.   Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(Check all that apply)*

     **X** Federal question            ' Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

## A.   If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

<u>4th Amendment (Unlawful Search & Seizure)</u>

<u>5th Amendment (Self Incrimination)</u>

<u>6th Amendment (Right to Fair & Impartial Trial)</u>

<u>8th Amendment (Cruel & Unusual Punishment)</u>

<u>14th Amendment (Due Process)</u>

<u>Title VII Civil Rights Violations & the ADA</u>

**B.** **If the Basis for Jurisdiction Is Diversity of Citizenship (N/A)**

1.The Plaintiff(s)

a. **If the plaintiff is an individual**

The plaintiff, *(name)* _____ , is a citizen of the
State of *(name)* _____ .

b. **If the plaintiff is a corporation**

The plaintiff, *(name)* _____ , is incorporated
under the laws of the State of *(name)* _____ ,
and has its principal place of business in the State of *(name)*
_____ .

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. **The Defendant(s)**

a. **If the defendant is an individual**

The defendant, *(name)* _____ , is a citizen of
the State of *(name)* _____ . Or is a citizen of
*(Foreign nation)* _____ .

Page 3 of 5

    b.    If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____

Or is incorporated under the laws of *(foreign nation)* _____

and has its principal place of business in *(name)* ___

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy-the amount the plaintiff claims the defendant owes or the amount at stake-is more than $75,000, not counting interest and costs of court, because *(explain)*:

Plaintiff is requesting $1,000,000.00 for the court costs, deprivation of rights, emotional distress, loss of wages, and medical bills.

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

## SECOND AMENDED COMPLAINT

Plaintiff Cameron Lacroix brings this Complaint seeking damages against Defendants for carrying out psychological warfare against him and taking steps to advance an undercover mission at the expense of his mental health. Dozens of agents have participated in various events to include computer hacking, harassment, evidence planting, and stalking. Furthermore, Plaintiff asserts that the federal agents utilized multiple confidential informants throughout a multiyear investigation based on false pretenses. At least one of those confidential human sources was used to gain insight into his mental state rather than utilize legal processes for protected material under HIPAA. Defendants are charged in their individual capacities for violating Plaintiff's constitutional rights and these allegations should not be considered under the Federal Tort Claims Act. Plaintiff's tort claim to the FBI was mailed on November 23,

2025 and received at the DOJ's Tort Divison's Mailbox on December 1, 2025. *(see USPS.com Tracking No. 9507106591065327425490)*. FTCA claims will be raised after the passage of 6 months or their denials.

## RESIDENCE AND WORKPLACE OF PLAINTIFF

The Plaintiff was incarcerated for a violation of supervised release for a 21-month period running from July of 2019 to April of 2021. He spent the last 60 days of Bureau of Prisons custody in the Coolidge House which is a Residential Reentry Center ("RRC") located in Boston, Massachusetts. Additionally, he was hired by Amazon while in the RRC on April 3, 2021 and officially released on April 5, 2021. He was hired as a Part Time Grocery Shopper and as of this writing owns the business title of Program Manager I. Plaintiff does not hold a college degree and has had favorable performance reviews throughout roles.

For all purposes the Plaintiff lived with his family at 680 Worcester Street Apt 101 in Wellesley, MA from April 1, 2025 until November 7, 2025. Plaintiff's spouse moved out around September 16, 2025. Plaintiff now resides at 270 Grove Street Apt 6 in Auburndale, MA and his spouse resides elsewhere.

## ALLEGATIONS

1.  The Federal Bureau of Investigation is aware of the fact that Plaintiff has a history of mental health issues and is currently involved in treatment as he's been under constant physical surveillance. In 2014 the Plaintiff agreed to provide his presentence investigation report ("PSR") to the FBI's Behavioral Analysis Unit ("BAU") synonymous with his conviction on various computer offenses *(see United States v. Lacroix, 14-CR-10162-MLW, District of Massachusetts)*. The PSR informed the Court and FBI that he struggled with anxiety, depression, and substance abuse. During this time Plaintiff engaged in a very serious criminal act by repeatedly hacking into law enforcement servers to determine whether he was under investigation *(see PSR pg.5 at 12-13)*. The document authored by U.S. Probation contained Plaintiff's admission that substances made him so paranoid that he thought law enforcement officials were following him *(see PSR pg. 20 at 75)*.

2.  Plaintiff has reviewed a public copy of the Attorney General's Guidelines on FBI Undercover ("UC") Operations dated May 30, 2002. The first step under Section IV discussing the authorization of UC operations states that "Any official considering approval or authorization of a proposed undercover operation…"," shall weigh", and "The risk of personal injury to individuals". Plaintiff asserts that these guidelines were not followed and Government agents acted negligently and in bad faith to not consider any risk to Plaintiff's mental health when working on the operations' application.

3.  For the last few months federal agents have taken steps to break, pressure, and provoke Plaintiff by authorizing invasive, intensive, and obvious physical surveillance. The Government's risky techniques nearly emulated the scenario from 2012 which cost the Plaintiff a psychotic episode resulting in his admission into the Emergency Room. Plaintiff prays that the Court hold Defendants accountable for negligently authorizing and engaging in an undercover operation designed to compromise his wellbeing. Finally, Plaintiff charges that the Government's actions led Plaintiff into believing that his liberty was

restricted at certain points in time as there have been more than 50 agents surveilling him at one location, while on road, and in Amazon's Boston Office where he works.

4.   Plaintiff mentions that the Government is trying to destroy his life. In this unusual case Plaintiff claims that unknown agents hacked Plaintiff's wireless network over the summer and intruded into his apartment which both contributed to the breakdown of the relationship between him and his wife. He has been harassed, insulted, and intimidated just days after he mentioned this suit on social media. The Plaintiff's mental health issues were in remission until the discovery of some of the Government's hacking and intensive physical surveillance.

5.   In July of 2019 Plaintiff self-surrendered to FMC Devens in Ayer, MA to begin serving a sentence for a violation of supervised release. Prior to the surrender however, Plaintiff had been told by his lawyer that the Government claimed they were not looking to prosecute him.

6.   In February of 2021 an FBI agent contacted another FBI agent via e-mail concerning the Plaintiff. The contents of the communication were unknown but there was a response to an outside individual telling them that Plaintiff had recently been released to a halfway house and that they could call their cell phone if it was urgent. A formal interview was conducted between a Special Agent and a still unknown individual.

7.   On April 3, 2021 Plaintiff was hired by Amazon as a Part Time Whole Foods Shopper. He was also employed full time as a driver for Clover Food Lab, a Boston area restaurant chain.

8.   On April 5, 2021 the Plaintiff was formally discharged from Bureau of Prisons custody and moved into the apartment he had lived in with his spouse since February of 2019. U.S. Probation had assisted with the installation of internet monitoring software as it was a requirement of supervised release which remained in effect until his discharge in January of 2023. This software captured all activity on the screen and acted as a key logger. Plaintiff had never changed his passwords and this information was freely available to the Government.

9.   In the end of December 2021 or early January 2022 Plaintiff reported to work and was greeted by an Amazon Loss Prevention Specialist known by the initials K.E. Plaintiff asked if he could use the workstation as he needed to clock in and K.E. told him sure no problem. K.E. chatted Plaintiff up and said that the workstation in front of them was like a "gold mind" and that K.E. has one at his house. K.E. told Plaintiff that he was investigating some recent thefts concerning Amazon Gift Cards and wondered if he could use the computer to try and pull the account numbers up for him. Plaintiff said he wasn't comfortable doing that but that K.E. could use the workstation himself to do so if he wanted to. K.E. said never mind, saying it was fine and to carry on with his day. Plaintiff felt anxious as if he was being judged due to his criminal past.

10.  On September 27, 2024 an undercover agent ("UCE-3") known by the initials R.M. was arrested by Wellesley Police for OUI-LIQUOR OR .08% c90 s24(1)(a)(1) and ABUSE PREVENTION ORDER, VIOLATE c209A s7. According to Dkt. No. 2454CR0012** (Partially Redacted) he spent the weekend in the Dedham House of Correction and was released by the Dedham District Court on September 30, 2024.

11. On October 1, 2024 the Dedham District Court allowed the Commonwealth's motion to revoke UCE-3's release and was again incarcerated at the Dedham House of Correction.

12. On November 1, 2024 UCE-3 spent 30 days in custody before being release with conditions which included a GPS monitoring bracelet and an order to stay out of the Commonwealth of Massachusetts

13. On March 27, 2025 UCE-3's conditions were modified to include stay away from court ordered location, no contact with the victim/witness, and GPS monitoring.

14. On April 1, 2025 Plaintiff moved into 680 Worcester Street in Wellesley, MA with his family. During this month an undercover employee ("UCE-3") had also moved in to 680 Worcester Street in Wellesley. Shortly after moving in, UCE-3 introduced himself to Plaintiff asking where he worked, how much he made, did he live in a subsidized unit, and how much his unit costed. During a subsequent conversation UCE-2 also conveyed that his wife was a b***h, took his house, and his kids away. He stated they were working through a divorce.

15. On April 13, 2025 Plaintiff transferred his cell service to Visible by Verizon Wireless because of issues with his Mint Mobile service. For multiple months his cell service was consistently being reduced to 2G/EDGE service. Plaintiff cannot substantiate the claim that the Government caused this but notes that cell site simulators used by the Government have the ability to wiretap phones operating at the 2G band.

16. On May 5, 2025 UCE-3 pleaded to sufficient facts and was sentenced to a term of probation.

17. On May 31, 2025 Plaintiff reached out to the Wellesley Police's Records Secretary Cheryl Carlson asking for UCE-3's police report because of inappropriate comments that he had made to he and his daughter S.J. Plaintiff's daughter said that UCE-3 would always try to talk to her when she would be outside practicing volleyball and Plaintiff felt he was being overly intrusive. Plaintiff learned of the arrest based on a Google search which was scrubbed from the internet at some point after agents observed this in Plaintiff's Google Account.

18. On June 9, 2025 Plaintiff switched back to Mint Mobile in order to receive a discounted phone and cellular plan. Plaintiff eventually began having issues with Verizon's Visible network where he would encounter too many dead zones in urban areas.

19. On June 11, 2025 Plaintiff commuted to work by way of the Wellesley Square Commuter Rail to South Station. At 10:32 AM Plaintiff used his BlueBikes rental key fob to rent a bicycle at 10:32 AM. Once arriving near his office he realized he left his keys inside of the BlueBikes kiosk. He travelled back to South Station and they were not able to be found anywhere. He utilized the BlueBikes Mobile App to then return to work.

20. On June 11, 2025 Plaintiff called BlueBikes and cancelled his fob so it could not be used. Around 5:29 PM Plaintiff had received a voicemail indicating that a government employee had possession of his keys and that they would turn them in to Boston City Hall the next day. At 10:26 AM Caleb Bove of Boston's Transportation Department stated that he had the keys and it was later learned that the keys were actually given to another employee named Louisa who had then gave them to Caleb. These keys contained Plaintiff's key fob to his home.

21. On or around June 13, 2025 Plaintiff began working on documents related to the sealing of his past state criminal convictions to help overcome barriers faced surrounding his criminal history.

22. On June 30, 2025 Plaintiff submitted several FOIA requests to various federal agencies to obtain records. Plaintiff requested these records in furtherance of writing a life story the following year to help those avoid similar situations he's experienced.

23. On July 5, 2025 Plaintiff sent an e-mail to the U.S. Attorney's Media representative for the District of Massachusetts requesting the removal of a 2019 press release concerning a supervised release violation which appeared to be prejudicial *(See https://www.justice.gov/usao-ma/pr/recidivist-hacker-sentenced-violating-supervised-release-conditions)*. Plaintiff's e-mail noted that hiring managers mistakenly believed that he had an additional conviction which caused him to be passed up for several jobs and at least two apartments (apartments not cited in e-mail). Plaintiff sent the e-mail from his student e-mail account with Western Governors University. A similar e-mail was also sent to the U.S. Attorney for the District of Massachusetts known as "L.F." and her assistant. and had sent a similar e-mail to the U.S. Attorney for the District of Massachusetts. . He also sent an e-mail directly to the U.S. Attorney for the District of Massachusetts and assistant to ensure the request was reviewed.

24. On July 14, 2025 Plaintiff received an e-mail from Stephanie Parkhurst who is the realtor with J. Derenzo Properties LLC, his property manager. Stephanie asked that Plaintiff fill out an IRS form that would be used to record their security deposit. Plaintiff was wondering why this was necessary but filled out the form anyway.

25. On or about July 15, 2025 Plaintiff went to his office and dropped off his belongings in order to head over to his wife's naturalization ceremony. Plaintiff left his office and met his family several blocks from the John Joseph Moakley Federal Courthouse in Boston which was within walking distance. Plaintiff and his family all turned their cell phones into the U.S. Marshal at the front desk. Plaintiff noticed that a man named Philippe ("UCE-4") who was known to Plaintiff as a Program Manager working for Amazon was there. It was later learned that Philippe is a Special Agent based out of Texas supporting a botched investigation to frame Plaintiff with false charges. Plaintiff alleges that Philippe was there to monitor Plaintiff and keep track of their location while Government agents made illegal entry into Plaintiff's home or tampered with his phone.

26. On July 19, 2025 a laptop within the Plaintiff's household began transmitting personal files to an external server without authorization. The files that were transmitted included photos of his family, their application for subsidized housing, immigration applications, tax and financial information, and the logins and passwords to Plaintiff's brokerage accounts. This information was learned several months later after Plaintiff took part in a forensic review of the computer.

27. On July 25, 2025 a fire alarm went off in Plaintiff's home while he was at work and his family was forced to exit. During this time, Plaintiff believes that the Government made unauthorized entry into his home to tamper with electronic devices.

28. On July 26, 2025 Plaintiff met an individual known as M.L. who he knew to be an FBI confidential human source ("CHS-3"). During this meeting Plaintiff informed M.L. that he was not engaged in crime any longer and proudly had become a family man. Also during this meeting Plaintiff found it uncomfortable that M.L.'s associates that were

accompanied M.L. had asked Plaintiff to join them later that night as they would try to hook up with some women. Plaintiff declined stating that he was a married man.

29. Throughout the month of July 2025 Plaintiff's desk at work was directly positioned to the left of an individual that Plaintiff knows was working on the Government's behalf. The individual is known by the initials A.T. and had told Plaintiff on one occasion that he was an immigrant from Lebanon and that he "would do anything for a green card". At some point, A.T. began befriending Plaintiff by providing him with a Shake Shack sandwich without anything in return and sometimes offering him snacks when he had extra. Plaintiff viewed this as an act of kindness.

30. A.T. repeatedly told Plaintiff that he was stressed out from work being heavy. Plaintiff himself had been overloaded with work and had told A.T. that it's just the way it is and agreed that it was stressful. Plaintiff stated to A.T. and others in the office that his manager had left her position and the role would not be refilled. A.T. at times would randomly tell Plaintiff "f*** Amazon man" and Plaintiff reluctantly said things such as "yeah man it's a lot or yeah f*** this". Plaintiff however did not feel ill-will towards the company and was merely trying to let A.T. know that he was being heard by someone. Plaintiff also heard the same from the individual positioned directly to his left known as Y.T., a Technical Program Manager with Amazon, however the language was not vulgar. Plaintiff communicated in the same fashion. Plaintiff believes that Y.T. and A.T. were both acting to egg Plaintiff on and exploit Plaintiff's method of showing acceptance to morph it into incriminating statements. Plaintiff asserts that this was manipulative and harmful to his mental health due to the deception.

31. On a date between June 15, 2025 and August 31, 2025 Plaintiff was at his residence located at 680 Worcester Street and entered the lobby. Plaintiff observed a bank card placed in the center of a table and picked it up to read the name. Plaintiff placed it back on the table. Plaintiff believes this was a scheme to entice or entrap Plaintiff by unknown Government agents.

32. On July 29, 2025 a Duty Attorney responded to Plaintiff's request to remove the prejudicial article saying that they will remain on the internet permanently or at a minimum approximately 15 years.

33. In early August 2025 T.C., a Business Analyst with Amazon and colleague of Plaintiff approached his desk to strike up a conversation. T.C. told Plaintiff that he was thinking about having his wife work for Amazon but was concerned that it would be unethical. Plaintiff told T.C. that his own wife works for Amazon and all he had to do was just make sure he followed proper channels. Plaintiff told T.C. that he received clearance from his direct manager and PxT (HR) before having her apply.

34. On August 4, 2025 a computer used by an UNKNOWN DEFENDANT AGENT had accessed Plaintiff's wireless network without authorization.

35. On August 7, 2025 Stephanie Parkhurst of J. Derenzo Properties e-mailed Plaintiff an addendum related to their lease, asking for a signature. The addendum contained clauses indicating that Plaintiff could not hold the Owner liable for any wireless interception that occurred on the property if wireless was provided locally. It also contained an additional clause stating that no unit shall embark in any type of sound or audio recording. Plaintiff signed the agreement while his spouse did not, but the date appeared to only cover August 7, 2025 on. Plaintiff did not notice these strange additions and merely signed away.

36. On August 13, 2025 Plaintiff was asked by a colleague known as T.C., believed to be working at the direction of the AI-1 to have him test out an Excel file. Plaintiff opened the file and it made a number of connections to a SQL database that he did not have authorization to access. The query extracted pay details for a number of employees for his organization.

37. On August 13, 2025 Plaintiff commuted to work using the Wellesley Square Commuter Rail. Upon arriving at South Station, he exited the terminal and rented a bicycle using the fob on his key chain at 1:37 PM. At 6:11 PM Plaintiff realized that his keys were missing from his desk area. Plaintiff was able to rent a bike at 8:53 PM to get home using an app as the fob was no longer in his possession.

38. On August 14, 2025 a sexually explicit message was sent to Plaintiff's Google Account clacroix@gmail.com using Google Groups. The message said in part "Invitation to join SexAre you in a Relationship?" and indicated it was an exclusive adult community. Plaintiff did not initiate this request.

39. On August 14, 2025 Plaintiff retrieved his keys late afternoon from the Lost and Found at the South Station Bus/Train Terminal. Plaintiff was told that a conductor found his keys on one of the trolleys which was unusual because he had to use his keys in order to rent a bicycle. Plaintiff then commuted home from work.

40. On August 15, 2025 a computer used by an UNKNOWN DEFENDANT AGENT had accessed Plaintiff's wireless network without authorization.

41. On August 30, 2025 Plaintiff received an e-mail from Google indicating that his Gmail account had a suspicious login attempt which was unexpected.

42. On August 31, 2025 Plaintiff discovered that a sophisticated rootkit had been installed on a computer in his household.

43. On September 3, 2025 at 6:32 AM Plaintiff could not use his cell phone as it was displaying faulty overlays and decided to finally try a factory reset. Faulty overlays are a feature of sophisticated malware that lets an attacker gain unauthorized access to an account where the user enters his or her details into a fake username and password field. He had to receive a new eSIM card number in order to complete the transfer.

44. On September 3, 2025 at 9:32 AM Plaintiff again noticed that his phone was being remote controlled by an attacker. He again factory wiped the phone and obtained a new eSIM card number.

45. On September 4, 2025 at 5:36 PM Plaintiff contacted Western Governors University's IT Department by phone to report an inability to access his school's account and Gmail. Plaintiff now knows that he was not able to sign-in to his account due to an advanced law enforcement technique which restricted some features of the web browser. For example, Plaintiff was not able to utilize the Incognito browser which ensures cookie files are not retained. Plaintiff was eventually able to sign-in after not using the Incognito (private browser) and believes the malware did this deliberately so it could capture keystrokes. This malware also negatively influenced the social media feed of Plaintiff's LinkedIn account and caused it to inflict psychological damage to Plaintiff.

46. On September 5, 2025 Plaintiff received an e-mail from X.com indicating that his social media account was accessed from another device which was unexpected.

47. On September 5, 2025 Plaintiff suffered a panic attack and told his wife that he felt like someone wanted to hurt him and he didn't know why. Plaintiff's wife helped calm him

down and the two went outside for a walk to pray. Upon exiting the residence and going out into a nearby field the Plaintiff and his wife prayed together near what's known as Sprague Field in Wellesley. Upon heading back to their residence the Plaintiff saw a drone in drone directly above his home at a very low altitude as to where it seemed to be about 20 feet from the roof. Plaintiff

48. On September 5, 2025 Plaintiff spoke to his manager known by the initials L.G. as well as his HR contact known as A.G. about some mental health challenges he had been facing. Plaintiff requested a three week leave of absence beginning on September 5, 2025 so he could work on his relationship with his spouse, grieve about a death in the family, and work on his mental health as he was exhausted. It was approved.

49. On September 6, 2025 Plaintiff e-mailed his mentor at Western Governors University asking about the possibility of Two Factor Authentication being added to his student account. Plaintiff reported that a computer in the household was infected with a rootkit and he was concerned about his credentials being stolen. Plaintiff also noticed that his school's Google Account had been restricted where his free space had been reduced to zero.

50. On September 7, 2025 Plaintiff reported to Amazon that he had discovered that malware was definitely installed on his work laptop and needed assistance.

51. On September 8, 2025 a sexually explicit invitation was sent to Plaintiff's Google Account clacroix@gmail.com which read in part "Invited you to join Private Room Only For Naughty Minds". Plaintiff did not initiate this request.

52. On September 14, 2025 Plaintiff interacted with two individuals that were moving out of 680 Worcester Street Unit 104 in Wellesley, MA. and observed all of their belongings being taken out by movers. Plaintiff spoke with a white male that was with an Asian female who appeared to be occupants or designated owners of the unit. The male told Plaintiff they only stayed there for about three months and were indeed leaving.

53. On September 14, 2025 Plaintiff self-reported to the Newton-Wellesley Hospital's Emergency Room and was evaluated for symptoms of anxiety and psychosis. Plaintiff was accompanied by his spouse ("K.P." previously known as "I.P.") and his church pastor ("M.M."). Once admitted only his wife remained. Plaintiff saw multiple members of medical personnel and reported that he thought people were following him and worried that he'd be killed. At some point a man not wearing medical attire seized Plaintiff's bookbag and was told that it would be searched in another location. After several hours Plaintiff had stabilized and released due to not posing a danger to himself or others. Plaintiff was recommended to follow up with his provider and also look into services provided at Newton-Wellesley Hospital. Plaintiff's bag was later returned to him.

54. On September 15, 2025 Plaintiff believed that there may have been an unauthorized sign-in attempt made into his LinkedIn account based on login history.

55. On September 16, 2025 UCE-3's criminal docket had an entry indicating that his OUI charged was removed and updated to SEALED.

56. On September 16, 2025 Plaintiff saw Nurse Practitioner Daisy S. at Boston Medical Center for symptoms of anxiety, depression, and schizophrenia. Plaintiff was evaluated and prescribed Effexor which treats symptoms of anxiety and depression based on a family member's success with it. The Nurse Practitioner said she was concerned about the

schizophrenia diagnosis and processed a referral for psychiatry. She said that they would be the ones best equipped to support him.

57. On September 20, 2025 Plaintiff logged into his household's wireless router provided by Xfinity which is when he initially discovered that the two unauthorized devices accessed the network using the correct password a month earlier. On August 4, 2025 an unknown individual used a computer to access Plaintiff's wireless network without authorization. This computer identified itself using a local hostname of DESKTOP-JJK5S8E with a network MAC address of 104A7D0F4E70. On August 15, 2025 an unknown individual used a computer to access Plaintiff's wireless network without authorization. This computer identified itself using a local hostname of DESKTOP-T1KP1AQ with a network MAC address of 68342123FB63. According to macvendor.com both of these MAC addresses were manufactured by Intel Corporation and the Xfinity Gateway reported that each machine was running the Windows 10 operating system. Plaintiff believes all Defendants are responsible as well as unknown agents whom physically operated the computers.

58. On September 21, 2025 Plaintiff tried to follow up with an OIG complaint concerning a negative DOJ press release using his e-mail account at Western Governors University. Plaintiff's e-mail bounced back with a message indicating that he was restricted from communicating with the OIG's domain ("usdoj.gov") e-mail address.

59. On September 22, 2025 Plaintiff's Fennel Brokerage account was accessed without authorization. Plaintiff spoke to Fennel's Account Support team who initially said they could not find any IP address despite the login notification coming to his e-mail. Account support followed up at a later time with an IP address that appeared to be a proxy server based out of California, not used by Plaintiff.

60. On September 22, 2025 Plaintiff reached out to his landlord asking if he could have a printout showing who had accessed their unit based on the key fob swipes. Their maintenance tech known by the initials D.D. told plaintiff he would provide them via a telephone call. Plaintiff reached out to D.D. via e-mail asking for the logs and was instead told that they would only provide it to law enforcement upon request. Plaintiff became increasing suspicious that his neighbors had something to do with the unauthorized entry due to limitations on how far his wi-fi could broadcast a signal. Plaintiff recalled leaving his apartment sometime after sending the e-mail and noticed that nearly every car in his parking garage had vanished which was unusual.

61. On September 23, 2025 or slightly earlier Plaintiff received a targeted e-mail from an unknown hotmail.com account with the following message: "I am out of bathbombs. I will take $40 with please. At your convenience. Thank you, Margaret Smith,". Plaintiff does not know this individual and based on the Plaintiff's recent understandings believes that this may have been an attempt to place incriminating e-mails into the Plaintiff's mailbox. Plaintiff believes an unnamed agent of an unknown agency committed this act in order to manufacture evidence and advance an investigation.

62. On September 24, 2025 Plaintiff posted to social media mentioning that internet capable devices in his household were hacked with malware which had the ability to manipulate his social media feeds to display negative news, transfer files, and enable session hijacking. Two members from Amazon Web Services viewed Plaintiff's LinkedIn

profile within a day of this post as well as several in other unknown departments also at Amazon.

63. On September 24, 2025 Plaintiff received a connection request from a man known by the initials D.N. who is a graduate of Western Governors University and involved in their ambassador program. D.N.'s profile indicates he is based out of New York and has an interested in the FBI Cyber Division page.

64. On September 24, 2025 unknown federal agents deployed a cell site simulator which interfered with Plaintiff's ability to seek out treatment pursuant to the Emergency Room's guidance. Plaintiff attempted to call the Newton-Wellesley Hospital's Substance Use Disorder clinic but the call continuously cut out multiple times. Plaintiff was only able to speak with a provider, known as Jasmine, without interruption by using Google Voice which relies on data rather than cellular routing. On October 29, 2025 the Plaintiff complained to Mint Mobile about constant interruptions to his service when placing calls close from his residence. The representative mentioned that others were having issues in the area and to rectify their tech team would try updating the software on the tower. The representative informed him that tower was very close and was found to be a repeater affixed to a utility pole directly in front of 680 Worcester Street in Wellesley, MA (Plaintiff's residence at the time).

65. Between September 25 and September 30 Plaintiff's leave of absence was extended to November 20, 2025 upon his own request. Plaintiff was struggling from on-going mental health challenges stemming from the Government's hacking campaign, phone jammers, and drone surveillance.

66. On September 30, 2025 Plaintiff advised his property manager that he could no longer manage paying the rent on his own as he and his wife were physically separated. Plaintiff requested to be out by November 1, 2025 but our property manager said it would be dependent on whether or not they could secure a new tenant. On October 28, 2025 Plaintiff's property manager said that they could not find someone and we would have to pay for November and now wait until December 1, 2025. Plaintiff experienced emotional and financial distress as he learned that other tenants such as Unit 104 and Unit 105 were allowed to vacate without finding replacements. Plaintiff now believes that he was likely denied exiting the lease because of pressure from Government agents running the undercover operation.

67. On October 2, 2025 Plaintiff left his apartment to go out and get takeout. Upon entering his parking lot area he observed a man with a dark colored hood near his vehicle. To the side of the man it looked like he had a cart that looked like a toolbox. Plaintiff was initially alerted and thought someone was trying to break into his car. Plaintiff rolled his window down and asked if he needed something once he turned his car on but the man said "nope". The location of Plaintiff's car was very close to the end of the lot and because there was soil to the right of him, it made very little sense for a man to be over there with a toolbox on wheels. Plaintiff believes this was an attempt to make him feel unsafe as he reached out to his property manager for help but they ignored his e-mail, likely due to pressure from the Government.

68. On October 6, 2025 Plaintiff listed a $200 Best Buy Gift Card on eBay obtained through a trade-in opportunity.

69. On October 7, 2025 Plaintiff was informed that the gift card had been purchased by a man residing in New York. Plaintiff received an eBay message from a separate account not associated with the purchase asking for the card number. Out of an abundance of caution and worrying that devices may still be hacked, Plaintiff cancelled the sale and refunded the payment.

70. On October 7, 2025 Plaintiff attended an appointment with his Primary Care Physician Dr. Jonathan B. at Boston Medical Center. Plaintiff was seen for symptoms of anxiety, depression, and schizophrenia. Plaintiff was evaluated and had his medication changed to Bupropion due to negative effects while on Effexor. Plaintiff's Primary Care Physician inquired about the psychiatry referral and thought it would be helpful for his mental health. He submitted a second referral for their Integrated Behavioral Health ("IBH") team which might be able to see him much sooner.

71. On October 12, 2025 Plaintiff asked Western Governors University's IT department about the space restrictions placed onto his Google Account which were noticed a month earlier. Plaintiff was told that this was unusual and that they would look into it.

72. On October 15, 2025 Plaintiff was told by Western Governors University's IT department to not worry about needing to use Google services and to rather use OneDrive instead. Plaintiff's support ticket was resolved.

73. On October 20, 2025 Plaintiff met with his Primary Care Physician Dr. Jonathan B. via a tele-med appointment. Plaintiff reported some progress with the medication but felt it was wearing off. Plaintiff's medication was increased to a higher dose. Plaintiff had not heard from any member of psychiatry and his physician said he would reach out to their management to get the ball rolling.

74. On October 27, 2025 Plaintiff met with a member of the IBH team at Boston Medical Center and completed an intake. Plaintiff's enrollment in IBH was in response to his complex mental health conditions and Plaintiff has been holding on to discussing core issues until this point. Plaintiff believes that the Government will try to manufacture additional evidence based on to the trauma he's experienced.

75. On November 3, 2025, the Plaintiff introduced himself to a man who identified himself as JOE ("UCE-2"). UCE-2 had been sitting in a white Toyota truck that was idling in Plaintiff's apartment's parking lot. Plaintiff asserts that this is an undercover agent participating in the investigation and conspiracy to injure plaintiff's mental health. Plaintiff asked UCE-2 which building he lived in to which he pointed at a building across the compound. Plaintiff asked what his building number was but he could not provide it. UCE-2 told Plaintiff that he should be careful because Plaintiff's neighbor was "weird". UCE-2 further said Plaintiff's neighbor was selling sexual homosexual services and this statement was intended to trigger Plaintiff's anxiety, depression, and make him uncomfortable.

76. On November 4, 2025, the Plaintiff's birthday, unknown defendant agents of the Government surveilled him so intensely that he could not go for a walk on a hiking path in Wellesley, MA without agents walking or running by him constantly. Plaintiff later walked by a believed surveillance agent and observed what looked like a text conversation on their iPhone. Plaintiff reportedly saw a photo taken of someone that he believes to have been him. Plaintiff became extremely anxious and felt like he was being stalked.

77. On November 4, 2025 Plaintiff pulled into Whole Foods Market in Wellesley, MA after feeling immense anxiety from the agents that had been walking past him. It was after

sunset by this time and he had went for a walk down a path that's connected to the Whole Foods parking lot. While on this path he saw a couple of men jogging by him with headgear that had lights affixed. Afterwords the Plaintiff returned to his vehicle to pray for nearly an hour.

78. On November 4, 2025 Plaintiff travelled to a CVS which is about 5 minutes driving distance from his apartment to replace a broken car charger. Upon exiting CVS he noticed that the empty parking lot now had 5 vehicles idling and they were positioned in a manner which looked like his car was surrounded, although it was not blocked off. Plaintiff felt immense anxiety and despite waiting in the lot for 20 minutes nobody exited their car and the CVS had closed.

79. On November 6, 2025 Plaintiff purchased a new cell phone after noticing that it again had malware remotely installed on it. Plaintiff believes that the malware was installed through a malicious software update.

80. On November 8, 2025 Plaintiff communicated with a convicted computer hacker and known FBI Confidential Human Source ("CHS-1") on LinkedIn. During the course of the conversation Plaintiff express that he had known about J.H.'s cooperator status and was not judging him for it to ensure there was comfort in the conversation. CHS-1 and Plaintiff communicated with Plaintiff about a myriad of topics which included Plaintiff asking if the government plants evidence on people which led to CHS-1 answering that the "feds never liked you". Given CHS-1's unique status as a previous cooperator, his knowledge of the feds not having a favorable view of Plaintiff is telling. CHS-1 made several leading conversations which Plaintiff found unusual such as "I just know that I always liked you" and that CHS-1 was "like a big kid". Plaintiff wasn't sure how to respond but told CHS-1 that he did not care whether CHS-1 liked him or not. Finally, CHS-1 specifically asked Plaintiff which medications had he been on. Plaintiff believes CHS-1 was likely acting on behalf of an unknown defendant agent.

81. On November 8, 2025 Plaintiff was at his current residence at in Auburndale, MA and overheard a telephone conversation between a presumed undercover employee ("UCE-1") who goes by a name bearing the initials of "B.M.". UCE-1 resides in the same apartment building as Plaintiff. To Plaintiff's understanding, UCE-1 discussed the organizing of an undercover operation against an individual that he had been working to get for about five years. UCE-1 admitted that he had f***ed up the case and said that it happens sometimes. He stated that he "forgot to put that in there", suggesting that something went unreported. It appeared that the unidentified party had asked a question to UCE-1 in responding that "it hasn't happened yet but it's coming". UCE-1 further went on to explain that that a team would be arriving in the area to handle the clean-up and that everything will be in place when the person UCE-1 was speaking to arrives. UCE-1 stated that there were approximately $6,000 worth of funds remaining in the bank account for expenses and he recommended using the nearby Marriot hotel as needed. UCE-1 indicated that they were going to have to collect all of his issued firearms from him. Plaintiff believes he was talking about retiring. UCE-1 also told the unidentified party that he's provided a new coat every year because they work outside and said that they could take some of them from him if he/she wanted.

82. On November 9, 2025 Plaintiff entered a Star Market in Auburndale MA to obtain a drink after his vehicle broke down after a misfire. Between the hours of 1200-1300 Plaintiff

traveled down an aisle and was met by an unknown agent conducting surveillance. The agent was a slightly taller white male wearing glasses and white air buds. The agent allegedly told Plaintiff "We're coming to get you, we're wherever you are". Plaintiff shouted, "why?" but the individual continued walking. Plaintiff purchased a sports drink at self-checkout and walked back to his vehicle.

83. On November 9, 2025 Plaintiff interacted with multiple neighbors in his building to ask if anyone knew if someone had entered his new apartment while he was not home. Plaintiff eventually knocked on the door of UCE-1 located in Unit 2. UCE-1 opened the door surprised and Plaintiff introduced himself. A moment later the male tenant living in Unit 4 exited his room to join the conversation. Plaintiff mentioned that whoever accessed his unit did not take anything and he thinks it happened due to markings on the wall that he had not noticed before. UCE-1 indicated that he knows professionals that execute covert break ins and they would never do something like that. Plaintiff out of curiosity asked like who and he mentioned law enforcement. UCE-1 later joked that the property manager should charge $500 less per month if the building is not secure and persons can enter using old keys for example. UCE-1 asked Plaintiff if he had any valuables in his unit to which he responded no and that the most valuable asset might be his work laptop that was untouched. UCE-1 said that he had many firearms in his apartment. Plaintiff asked him if he really had guns and UCE-1 responded excitingly "Yes, do you like them?". Plaintiff said no and added that he was not able to have one because of a felony conviction. UCE-1 told Plaintiff that he has a relative down in Florida who was a federal prosecutor and could help him out. UCE-1 went on to tell Plaintiff" I can make your federal problems go away". Plaintiff chuckled and said no thanks. Plaintiff was also told by UCE-1 that he will introduce him to the neighbors living there this summer. Plaintiff read this to mean that he may be apprehended around that time and felt that UCE-1 was trying to entrap him when asked about removing "federal problems". Plaintiff did not mention any federal problems.

84. On November 10, 2025 Plaintiff began drafting this lawsuit at the Boston Public Library at 700 Boylston St in Boston, MA. The Plaintiff noticed two men nearby were staring at him and were probably doing surveillance. Both male individuals were positioned near the windows closest to Computer#13 in the lab area. Agent-1was a white male and both were within an earshot's distance. Plaintiff clearly heard Agent-1 tell Agent-2 "I hope he doesn't start yelling when I search him, ha". This comment was made deliberately to trigger Plaintiff's anxiety and induce panic. Agent-1 and Agent-2 discussed the fact that Plaintiff had not posted anything to Instagram yet, suggesting that they were directly aware of Plaintiff's announcement on another social media platform where he said that he was going to file a lawsuit against the Government.

85. On November 10, 2025 Plaintiff logged off the computer as the library was preparing to close and went to look for books of interest. The Plaintiff was stalked by Agent-1 and a different female agent referred to as Agent-3. Agent-1 and Agent-3 furtively followed Plaintiff around the library in an obvious manner, trans versing from the first floor up to the third floor, in and around several aisles. Plaintiff looked behind him several times and each time both Agents would look away from him or immediately stop walking. At some point they stopped and the Plaintiff ended up behind both agents in an effort to continue looking for any interesting categories. As Agent-1 announced an intention to

search Plaintiff but no search took place, this close and obvious surveillance was performed to solely stalk and harass him.

86. On November 11, 2025 Plaintiff attended outpatient services at Newton-Wellesley Hospital for mental health treatment. Due to the Plaintiff's vehicle having broken down he travelled on foot. While walking there he noticed many people jogging even though it was cold enough for a winter jacket. At some point two young females jogged past him and one turned around saying "wow, you're a boss". Plaintiff believes these were agents and he was aggravated because he is still married despite being physically separated.

87. On November 12, 2025 Plaintiff asserts that unknown agents conspired to plant evidence in a rideshare vehicle to further their investigation. Plaintiff commuted to the Kelly Infiniti dealership in Danvers, MA to pick up his repaired vehicle. Plaintiff commuted using the MBTA's green line, red line, and commuter rail services. Upon arriving at the Commuter Rail Station in Beverly, MA the Plaintiff had requested a Lyft. His cell phone indicated that Agent-4 aka "JOSE" had accepted his request and would arrive in a 2014 Subaru Outback. Plaintiff observed Agent-4's vehicle prior to him being picked up and noticed a woman exit his vehicle using the rear passenger side door. Agent-4's vehicle pulled up against the sidewalk around the corner which influenced the Plaintiff to use the rear passenger side door, where a woman had been sitting. While in-transit, Plaintiff took a photo of a Toyota sedan that passed his Lyft who he believes is likely a female agent conducting surveillance. This individual is referred to as Agent-5. At some point during the ride Plaintiff noticed some items in the door's slot to his right and discovered that there were numerous receipts, papers, and packaging pertaining to American Express Prepaid Gift Cards. The receipts indicated that there were two prepaid cards and that they were each loaded with $500.00 at the Cumberland Farms in South Hadley, MA. The receipt noted that the load commenced on 10/28/2025. Plaintiff confronted the driver who seemingly could not provide any detail as to who had just exited his vehicle and mentioned that he had a prior criminal conviction related to fraudulent gift cards as such. Plaintiff repeatedly asked the driver if he knew anything as to why there would coincidentally be gift cards in a car he had gotten into. Agent-4 responded negatively. Plaintiff asked Agent-4 how long he had been driving and he said 2 months, however the Lyft app only mentioned that he had been driving for one. Plaintiff believes that his Lyft travel was observed by surveillance agents and one specific female, believed to be an agent, was seen driving a Toyota sedan out of the window. Upon exiting the vehicle, Plaintiff engaged Officer Robert Sullivan (Badge# 989) who also was coincidentally was at the Plaintiff's drop off point, Kelly Infiniti in Danvers, and the two discussed the matter that had transpired.

88. On November 18, 2025 Plaintiff left a friend's house where he had been working on this civil suit to avoid interruption and harassment in public. Upon exiting the residence plaintiff noticed a blue Hyundai sedan with a veteran plate drive down the street prior to Plaintiff getting into his car and the driver was looking at him. The blue Hyundai parked a block away, in front of another vehicle. This block is an open field so it was visible to Plaintiff. In his return home, he had to travel by the Hyundai and saw that both vehicles consisted of men in the driver seat, one wearing a baseball cap and hooded sweatshirt. Both males stared at Plaintiff as he drove by.

89. On November 19, 2025 Plaintiff filed the initial version of this complaint with the Court. Approximately 30-45 minutes later the Plaintiff observed two vehicles aggressively moving through congested traffic while he travelled south on I-93. One of these vehicles was a silver colored sedan and the Plaintiff recognized the driver who was a female with gray hair. The Plaintiff had seen her at some point in the recent past and believes she must be one of the case agents.

90. On November 21, 2025 Plaintiff received a dosage change related to his medication due to feelings of paranoia. Plaintiff states that paranoia is being caused by the Government's surveillance actions.

91. On November 24, 2025 Plaintiff filed his first amended complaint with the Court, adding in additional details including the allegation concerning AI-1 being arrested.

92. On November 25, 2025 Plaintiff was at work and overheard AMAZON INVESTIGATOR 1 ("AI-1") speaking on a video call in a loud manner. Plaintiff heard AI-1 speaking in code that he was leading an investigation which apparently was going to be sunset. The investigation surrounded a person that who's health care seemed to be at risk and it was being abandoned because there wasn't anything there (or worry about). Plaintiff thought that he might be talking about him because he had just came off of a mental health leave. AI-1 stated that he was the one who had been leading the investigation and made disparaging comments, presumably about law enforcement, not asking him to generate more incriminating statements by having individuals personally engage. Plaintiff had just returned to work and felt very uneasy about this but tried to not let it bother him.

93. On November 27, 2025 AMAZON INVESTIGATOR 1 ("AI-1") spoke to his FBI partners about the lawsuit Plaintiff filed a few days earlier. AI-1 specifically told them that the allegation concerning UCE-3 being arrested was going to impact them and that he guaranteed it. AI-1 continued on to say that he thinks that the timeframe noted in the lawsuit coincided with the timeline of events where investigators learned a key detail pertaining to a subject.

94. On November 28, 2025 an FBI Supervisor informed the team that all of their applications were being retracted and that the case had been moved back a step. According to a sensitive law enforcement document, page 19 summarily stated that internal investigators did not care if this was going to cause delays or if the evidence was already verified. The case agents are scheduled to attend an interview on January 5, 2025.

95. On December 2, 2025 Plaintiff was at work and overheard AI-1 discussing sensitive details about the FBI's investigation into Plaintiff. The individual on the other end of the call was another Amazon investigator ("AI-2") known as Anthony Leggett which may be a cover name. AI-1 said that it's really sad that FBI leaders kicked the case back and that everything was verified in his opinion. He explained that the search warrants were rock solid as they went through them with a DOJ attorney prior to having them signed off. He expressed frustration though because he had travelled to Miami to acquire a search warrant and was denied because of reliability concerns. Plaintiff believes this warrant could have been related to the malware being placed on his device. Plaintiff heard AI-1 say that they could do anything they wanted to him because they had him on distribution. This comment made Plaintiff extremely uncomfortable because he was not a drug dealer. AI-1 also made a comment suggesting that it was easier for him to do his work when Plaintiff was not on site (indicating that he would rather have him on leave). AI-1 went on further to tell AI-2

that non-Government law enforcement officers would re-create a situation which Plaintiff believed to mean that they might doctor up an investigative report that could have been rejected or make an excuse for some type of fallout. Additionally, Plaintiff heard him say something to the effect that something sort of ran in the family.

96. On December 4, 2025 Plaintiff was at work and started feeling anxious because he sensed that people were beginning to follow him inside of the office. Plaintiff contents that nobody followed him into a bathroom but that this had actually happened in the past at grocery stores in the public.

97. While Plaintiff was working from his desk he saw Philippe who Plaintiff also saw at his wife's naturalization ceremony. Philippe was sitting at a desk northwest from where Plaintiff sits and he was speaking loudly on a voice call. Plaintiff also heard the voice of AI-1 and could tell based on the timing of their voices that they were actually speaking with eachother. Plaintiff heard Philippe say to AI-1 "I have a great idea, how do you feel about temporary protection status right now?". AI-1 responded "I think that's a great idea, I like it. I'm aligned.". Philippe then said "ok I'll set the operation up, how does between 3:00 and 4:00PM sound?" AI-1 replied that it was good. Plaintiff had to pay for his parking meter at that time so he exited and headed out to his vehicle.

98. Once Plaintiff made it to his vehicle and paid for the meter he had noticed a group of group of six men and two females wearing yellow Verizon vests. They were talking about assembling a team and said that they wanted to wrap it up quick. A man was drawing an area with his finger saying that a few of you would take the front and the rest would take the rear area. Plaintiff was waiting to cross the street and he heard another person say F1 that's the location in front of F1 right? F1 is the desk where AMAZON INVESTIGATOR-1 sits and who had mentioned things related to Plaintiff. Plaintiff believes this was done deliberately to strike fear into him that something was going to happen to him between the hours of 3:00-4:00PM.

99. Plaintiff crossed the street and before getting to the office encountered a man with a dog that had a muzzle on, talking with a woman. Plaintiff heard the man tell the woman to make sure she grabs his phone while it's on. She asked how they are going to be able to do that and the man said "We can stage two dogs barking maybe and startle him since another guy has a dog up there". He then said "That's when we go in." They looked back, saw Plaintiff, and immediately walked away. Plaintiff was extremely nervous and quickly went back to his desk in the office.

100.    Upon entering the building Plaintiff got into an elevator with two men who had been following him closely once he entered the building. They were talking loudly and moving closer and closer to Plaintiff which made him move himself into the corner the elevator. Plaintiff eventually got off on his floor and rushed out to grab his belongings. Plaintiff closed his laptop and an individual known as J.G., an Amazon Program Manager whom Plaintiff now believes is an undercover agent, asked where is he going. Plaintiff told J.G. that he wanted to enjoy some freedom downstairs and he'll see him later.

101.    Plaintiff proceeded to the third floor cafeteria in the Amazon building and sat down against a wall for his own safety. Plaintiff opened his laptop and took a video call. While Plaintiff was seated, the empty cafeteria soon filled up with individuals that had Amazon loaner badges, indicating that they were let in by security without an official work Id. Plaintiff then noticed some familiar faces that he knows he had seen  somewhere else

and not inside of the building. As Plaintiff reached the end of his call an Asian man walked in front of his table and computer and pointed directly at him. An Asian woman that looked extremely young then sat directly to the right of Plaintiff.

102.    Plaintiff felt uncomfortable and went on to tell his manager that he wanted to step away from work due to an incoming panic attack. She approved and Plaintiff immediately left the building. Plaintiff got into his car and started screaming profanity once he closed the door in rage as the Plaintiff felt that the Government was doing this to destroy his mentality. Plaintiff later cried until he let out all of his emotions. Plaintiff eventually made it home and after words went to the library with his Amazon laptop to finish what work he left behind.

103.    That evening Plaintiff thought about everything that he had been hearing over the last few months and thought that it was odd that AI-1 mentioned distribution. Plaintiff thought about how the man directed the Asian woman to sit next to Plaintiff who looked extremely young and that there was a pair of girls that jogged by him a month earlier who made a comment. Plaintiff had also seen explicit items in his Google account at some point that he did not put there and over the last few months observed texts and calls from people he never knew. In addition, Plaintiff's wireless internet was being accessed for multiple weeks and he had no way of knowing if that happened at other places he had lived at either. Plaintiff also knows that his social media accounts were taken over in recent months likely because the Government had access to his household's wireless network and passwords from the RemoteCOM monitoring software while on probation.

104.    Plaintiff filed two ethics complaints about the man who was sitting in F1 which was the desk occupied by AMAZON INVESTIGATOR 1 indicating that he breached confidentiality and that he was discriminated against because of the mental health anguish he experienced from hearing this information.

105.    On December 5, 2025 Plaintiff arrived at work and his manager known as L.G. sent him a message at 11:33 AM asking if he was okay. Plaintiff said "I didn't feel that out of place today… so yeah nobody seems to be screwing around…"

106.    Minutes later Plaintiff heard a man known as Philippe talking over a voice call about details that sounded like it was pertaining to an investigation. Plaintiff knew Phillippe as a Program Manager with Amazon but now knows that he is an undercover FBI special agent. Phillippe was speaking to an individual he referred to as Armand and he was talking about trying to link IP addresses from Australia to China. Phillippe referred to an excel spreadsheet and said that he should look at the IP's in Column D. Philippe appeared to be explaining to someone who sounded like a superior as he was being asked to explain why he held a specific theory. Another individual that Plaintiff knew as an Amazon Program Manager, J.G., whom Plaintiff worked with on projects with going back the last year was also having a conversation that resembled an investigative conversation. J.G. told the person on the other end that they might want to avoid adding in a specific conversation into a document because it would be difficult to link back to the end user. J.G. said that they will have to do a lot more paperwork on it and it will be very complicated.

107.    Around 12:45 PM Plaintiff was approached by two men that identified themselves as security. One man known as Scott L. asked if Plaintiff could speak to them about a situation in a private setting. Plaintiff asked why and was told that BAC (Benefits Assistance Center) received a call asking them to conduct a wellness check. Plaintiff

agreed and followed them to one of the meeting rooms off to the side. The room is also known as a huddle room and it consists of a circular table with a flat edge against the wall, a television, a microphone, outlets, and a light/dimmer switch. The table could sit about four people. Plaintiff entered and sat at the left most seats, TJ sat blocking the doorway, and Scott sat across the table. Plaintiff felt like this was a law enforcement interrogation and asked both men to identify themselves. Each showed a yellow contractor badge which indicated that they're not Amazon full time employees.

108.    The other staff member identified himself as TJ Hannon. Plaintiff asked if he could record the conversation and both of them told Plaintiff no. Plaintiff stated that he has a pending lawsuit regarding harassment in federal court and he wanted documentation. They told Plaintiff that he's not allowed to record because of Massachusetts' one party consent rule and Plaintiff replied well at the federal level it's two party consent rules and my case is a federal question. Plaintiff was again told no.

109.    Plaintiff again asked for clarity as to why this happened and they repeated that the Benefits Assistance Centers had called for a wellness check to make sure I was ok. Plaintiff stated that it must be related to the ethics complaint, right? They said to tell them about that complaint, what happened? Plaintiff responded that it's against the NDA to tell non-Amazonians about internal reports so he respectfully said he would not tell contractors that. They said they were ok and TJ then conducted a Google search to find the lawsuit. Plaintiff told him what to search and TJ said wow, I can't believe it's on the internet, it gets there so fast.

110.    Plaintiff was asked if he wanted to go to the hospital and the Plaintiff said he didn't think it was necessary because he's being treated by doctors and he trusts his team's judgement. Plaintiff was asked what he was diagnosed with and Plaintiff said that's a HIPAA question but provided anxiety, depression, and schizophrenia. They asked Plaintiff if he took his medication and he said yes he did and was asked if he'd see EMS. Plaintiff said he would be willing to see EMS to ensure there was documentation since he had been facing harassment and discrimination at the workplace.

111.    Plaintiff asked if he could go back to work and was told not until he saw EMS. Plaintiff was frustrated because he was the one that agreed to talk with EMS. Plaintiff then asked if he could leave to get water and was told he could not leave, again, until he saw EMS. Scott offered to get him water though and he said he'll just sit tight then to speed things up. Within five minutes two men wearing EMS uniforms had arrived despite being on the 5th floor and having to be badged into the building. Plaintiff asked how they were able to get up there so fast and EMS said oh we are always around the corner. TJ told Jacob that they were told to speak to Plaintiff because of an ethics complaint that Plaintiff had filed. Both EMS agents were white males – one was named being Jacob with dark hair and another's name was unknown but was blonde.

112.    Plaintiff asked who called EMS and TJ said they had. EMS asked Plaintiff if he knew who the President was and what day of the week it was – both questions were answered affirmatively. Plaintiff asked who was paying for this visit and TJ told Plaintiff that he would not have to. Scott asked Plaintiff about maybe going home to work for the day and Plaintiff said he's not allowed to do that and that any accommodations like that must be approved through HR channels. Plaintiff then asked EMS what the callers had told them when they were contacted and Jacob said that they had a report of a man

hallucinating. Plaintiff immediately got upset and told Scott and TJ "what the heck is this?" The blonde haired EMS agent told Plaintiff it's just telephone tag, it must have gotten messed up and TJ quickly agreed.

113.    Plaintiff said he needed to get back to work because he just came off of leave and his performance might be affected. Plaintiff then demanded to leave asking "am I free to leave?" and that he felt his liberty was restricted. TJ told him that he was free to go and said something about putting a phone in a faraday bag which was odd (Plaintiff Googled this and does not have one of these items which blocks cell phone signals).

114.    Plaintiff returned to his desk and took a work related video call with some Senior-leveled stakeholders. Plaintiff immediate apologized to the group stating that something held him up. Within a few minutes of the video call the EMS Member Jacob entered Plaintiff's personal space and there was a black uniform with a badge clearly showing in the Plaintiff's webcam. Plaintiff felt extremely embarrassed and told Jacob to "please stop I'm on a call". Jacob started speaking loudly and Plaintiff handed him his ID so he could type his information in. Plaintiff then signed on the tablet before being able to return to the call.

115.    At the conclusion of the call Scott L. came over to Plaintiff and said that he thought it was a good idea if he went home and Plaintiff challenged the directive saying he was better staying put. Scott L. said that Plaintiff asked to go home and Plaintiff clarified saying "No, what I said was that any changes like that have to go through HR". Scott L. then said that he received permission from my HR contact about working from home the rest of the day. Plaintiff said no because his doctor's recommended that he work and stated that it's therapeutic. Plaintiff was told he should go home again and he responded that it's an inconvenience to the whole way home which is an hour and I do not have access to a comfortable cafeteria, coffee, and such. Plaintiff showed Scott L. the messages between himself and his manager known as the initials L.G. The conversation between them consisted of Plaintiff's manager checking in on him and her saying that she was happy that everything was ok. Plaintiff said his manager didn't seem to have a problem and that things only become problematic when people harass him. Plaintiff was being pressured to go home and said he's calling his attorney. At this point Scott L. and TJ Hannon stepped away and TJ immediately got on the phone.

116.    Plaintiff then messaged his Human Resources POC known as A.G. stating "... I was told just now by security in the building that it's ok to work from home but I didn't necessarily request this. I merely said to them that all requests … had to be cleared by you". Plaintiff supplemented that his boss checked on his wellbeing and Plaintiff suggested he continue working so he doesn't miss calls and just use one of the single rooms off to the side. A.G. told Plaintiff that he had a lot going on and to head home to work for the remainder of the day and to let her know if he needed any support. She also told Plaintiff to go home and be free from any distractions in the workplace.

117.    Plaintiff said "Sorry for the back and forth…. If I am saying I am ok and refuse … am I going to be written up?" and "I filed an ethics complaint yesterday and it's kind of like retaliation". A.G. replied that they just want to make sure they have the support I need. Plaintiff told her he refuses to leave and she said that Plaintiff reached out saying it was ok to work from home. Plaintiff responded "Oh nooo sorry I did NOT say that" and "they changed my words." A.G. told Plaintiff "Your performance is not in question right now and

is not affected. But yes, I am telling you to please work from home the remainder of the day". Plaintiff told her "ok I am staying put" and "ok I think I am good. The guy just texted someone". A.G. asked what Plaintiff meant and Plaintiff replied "there are two men here that are communicating via cell phone with a specific person. And I heard him say that he engaged someone. I then asked if I am being detained/free to leave and they said no. I was told that I can resume work". Plaintiff resumed work until being told that Boston Police was on site and he had to go. Plaintiff filed an ethics complaint after turning off his laptop and attempted to use the restroom. Scott L. came in urging Plaintiff to hurry up and Plaintiff said he wanted to wash his hands. Plaintiff was escorted out and saw AMAZON INVESTIGATOR-1 in the hallway staring at him as he got in the elevator.

118.    Plaintiff was informed by N.T. who is one step below Plaintiff's organization's Director. He told Plaintiff he'll chat with him on Monday and we can figure out what's going on. Within an hour of being walked out the Plaintiff was put on suspension. Plaintiff does not have a clear understanding as to why he was suspended as he was told that he would be working on Monday.

119.    After leaving work the Plaintiff immediately went to his parents' house as he felt like he was going to "lose his mind".

120.    On December 6, 2025 Plaintiff went to a CVS to pick up medication as his depression tablets were backing home and not with him. While at the CVS a couple resembling undercover surveillance agents would not leave Plaintiffs site. The couple patrolled multiple aisles without having anything in their hand, making eye contact with Plaintiff multiple times.

121.    On December 7, 2025 Plaintiff went with a family member to a local crisis center and checked in.

122.    Plaintiff states that he has been stripped of nearly every constitutional right as he is unable to live and breathe without constant surveillance. Plaintiff has also witnessed drones following him on multiple dates such as November 7, November 14, and December 6, which have also been witnessed by his Pastor known as M.M. and immediate family members. Plaintiff contents that he's lost his family, financial wellbeing, and almost all sanity. Based on the totality of the circumstances it is obvious that the Government has Plaintiff under multiple investigations and they are using these as a pretense to sabotage his mental health.

123.    Finally, Plaintiff believes based on words expressed by AI-1, FBI Special Agents, and his mere observations, the FBI and Amazon is working in tandem to frame him at minimum for access device fraud, distribution of child pornography, and exceeding access without authorization. While this is not the right Court to determine guilty or innocent, Plaintiff charges that the Government's actions based on the preceding events amount to a conspiracy to defraud the Constitution of the United States and his rights have therefore been violated.

## COUNT 1 - FALSE IMPRISONMENT, ARREST, and ILLEGAL DETENTION | FOURTH AMENDMENT

Plaintiff re-alleges the allegations in paragraphs from 1 - 123.

Plaintiff does not feel that he is free to travel as he pleases as there is virtually no privacy no matter where he seems to go while out in public. Plaintiff is under tight physical surveillance everywhere to include in his home, car, and even within the waiting rooms for each medical appointment.

Plaintiff states at a minimum that he was restricted from freedom and liberty on November 4, 2025, November 10, 2025, and November 12, 2025.

Plaintiff has gone for walks and felt confined to specific areas. Plaintiff was also harassed by multiple agents during the course of the events described.

## COUNT 2 – ILLEGAL SEARCH AND SEIZURE due to HACKING of WIRELESS NETWORK | FOURTH AMENDMENT

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff discovered that two individual computers had logged on to his household's wireless network without authorization. Plaintiff's network was password protected and the password was not provided to non-family members. Logs were retrieved from the Xfinity Gateway proving that the access did indeed take place by the two computers alleged in the complaint.

3. Plaintiff further believes that undercover agents resided at his previous apartment in Wellesley, MA as his property manager effectively stonewalled the attempt to learn if someone had entered his unit and pressured him to remain a tenant for as long as possible.

4. Plaintiff believes that unknown Defendant agents were the actors after overhearing UCE-1 talk about the undercover operation.

5. Plaintiff asserts that this was not carried out in good faith as the Government was negligent as evidence was relatively easy to obtain. Furthermore, the Plaintiff suffered anxiety and mental distress due to this intrusion.

6. Plaintiff contents that the Government violated his Fourth Amendment rights by accessing the network specifically on August 4, 2025 and August 15, 2025. If a warrant was secured Plaintiff re-asserts that a violation occurred if said warrant did not cover continuous access between those two dates.

## COUNT 3 – ILLEGAL SEARCH AND SEIZURE VIA OF CELL SITE SIMULATOR | FOURTH, FIFTH, AND EIGHTH AMENDMENT

7. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

8. Plaintiff experienced difficulty in placing an outbound call for medical services on September 24, 2025 causing him anxiety and emotional distress. After connecting, the Plaintiff could no longer hear the staff's voice after a short while. This led to issues

understanding what the provider was asking Plaintiff.

9. Plaintiff moved to another room and called back Google Voice which relies on a data session rather than cellular without issue.

10. Plaintiff received device alerts about the possibility of his phone connecting to an IMSI cell site simulator on October 7, 2025 and October 10, 2025 following a device upgrade.

11. Plaintiff believes unknown Defendant agents are responsible.

## COUNT 4 – RETALIATORY PROSECUTION | FIFTH, SIXTH, and FOURTEENTH AMENDMENT

12. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

13. Plaintiff points out that many of the events occurred after Plaintiff's initial escalation to the U.S. Attorney's Office via e-mail on July 5, 2025 and later to the Office of Inspector General.

14. Plaintiff also reached out to the U.S. Attorney known by her initials L.F. to ensure that the prejudice resulting from the article would not go unheard.

15. Plaintiff charges that Defendants known and unknown are retaliating against him and ramped up an investigation based on vindictive reasons.

## COUNT 5 – ILLEGAL SEARCH AND SEIZURE due to HACKING of CELLULAR TELEPHONE | FOURTH AMENDMENT

16. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

17. Between August 30, 2025 and September 5, 2025 a cellular telephone used by Plaintiff was being controlled by malicious software installed by unknown Defendant agents in collaboration with an external partner acting at the behest of unknown Defendant agents.

18. The malware interfered with the Plaintiff's usage of ordinary web browsing and forced him to login using less secure means.

19. The malware activated the Plaintiff's microphone and captured audio without authorization.

20. The malware altered the social media feed of his LinkedIn account to display negative stories such as employees hating their jobs and an individual being sentenced to prison for SIM swapping.

21. Plaintiff discovered that his device settings had been altered to permit the sharing of keystrokes between his device's Personal and Work profiles. This type of monitoring is invasive as it captures all keystrokes not limited to specific applications.

22. Plaintiff discovered that information from the cellular phone was being exfiltrated to a server without authorization.

23. Plaintiff experienced severe emotional distress and anxiety as a result of this intrusion.

## COUNT 6 – STALKING & HARASSMENT | Title VII Civil Right Act, American with Disabilities Act, Fourth Amendment

24. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

25. On November 9, 2025 the Plaintiff entered a Star Market in Auburndale, Massachusetts to purchase a drink.

26. Plaintiff travelled down an aisle and made eye contact with a tall man wearing glasses and what appeared to be air pods. The man referred to as UNKNOWN AGENT #2 told Plaintiff "We're coming to get you, we're wherever you are".

27. Plaintiff responded "why?" and UNKNOWN AGENT #2 walked away.

28. Plaintiff was effectively harassed for no reason other than to exploit his mental illness and instill feelings of anxiety and paranoia.

29. Plaintiff effectively felt seized in the moment as he was told by law enforcement that he is not going anywhere without the Government's presence.

## COUNT 7 – HARASSMENT, ILLEGAL DETENTION | Title VII Civil Right Act, American with Disabilities Act, Fourth Amendment, Fourteenth Amendment

30. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

31. Plaintiff announced on his social media account that he would be preparing a lawsuit against the Government. On November 10, 2025 he began working on it using the computer lab at the Boston Public Library located at 700 Boylston St in Boston, MA.

32. Plaintiff asserts that two male agents positioned themselves near the windows closest to Computer #13 where Plaintiff was seated. Plaintiff heard AGENT-1 tell AGENT-2 "I hope he doesn't start yelling when I search him, ha".

33. AGENT-1 also told AGENT-2 "I don't see anything posted on his Instagram yet", suggesting that they were monitoring his social media profiles which noted the lawsuit.

34. Plaintiff experienced emotional distress, anxiety, depression, and paranoia after hearing this comment. Plaintiff was also never searched which supports the notion that this was pure harassment. Plaintiff also avoided going to the restroom for as long as possible because of fear of an illegal detention for preparing the civil case.

## COUNT 8 – OBSTRUCTION OF JUSTICE / PLANTING EVIDENCE | Title VII Civil Right Act, American with Disabilities Act, Fourth, Fifth, Sixth, and Fourteenth Amendment

35. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

36. Plaintiff asserts that on November 12, 2025 that AGENT-4 operating a 2014 Subaru Outback bearing MA tag 4TEH62 through Lyft picked up Plaintiff on his way to pick up his car in Beverly, MA.

37. Plaintiff asserts that he was under surveillance from the moment he left his residence in Auburndale until he arrived in Danvers, using multiple trains, and finally his entire journey from the Beverly, MA in an effort to harass and stalk him. Plaintiff saw a female agent who was familiar to him surveilling his travel in the Lyft. She is known as AGENT-5 and was driving a Toyota sedan with MA tag 5PHD44

38. Plaintiff asserts that AGENT-4, AGENT-5, and others unknown conspired to plant evidence and associate it with Plaintiff by placing the packaging of 2 prepaid American Express Gift Cards in the back seat of his ride share, worth more than $1,000.

39. Upon Plaintiff's arrival at Kelly Infiniti, his final destination, there was a Danvers Police Officer parked directly in front of where Agent-4 dropped him off. Plaintiff approached the officer and informed him about what he found in the car and that he had a criminal history directly related to these types of cards.

40. The ordeal was captured on video and neither party objected to the Plaintiff recording.

41. Plaintiff experienced extreme stress from this situation and cannot utilize any ride share without significant emotional distress. Plaintiff suffered anxiety and panic attacks.

## COUNT 9 – ILLEGAL SEARCH AND SEIZURE - USING CI to CIRCUMVENT LEGAL PROCESS | Fourth and Fourteenth Amendment

42. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

43. Plaintiff asserts that an FBI CHS engaged him on LinkedIn on November 8, 2025.

44. Plaintiff learned that he was the subject of an undercover mission hours later.

45. Plaintiff believes that J.H. was acting at the direction of unknown agent(s) seeking information about Plaintiff's mental history rather than utilizing legal process to obtain protected HIPAA materials.

## COUNT 10 – ILLEGAL SEARCH AND SEIZURE – AMAZON ACCOUNT HISTORY| Fourth Amendment

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff asserts that an FBI CHS known as J.H. engaged him on LinkedIn on November 8, 2025, at the direction of unknown agent(s).

3. Plaintiff states that J.H. suggested that he obtain Raspberry Pi to setup an encrypted VPN to protect himself from being hacked.

4. Plaintiff coincidentally had a Raspberry Pi which was purchased from Amazon in September that was later returned.

5. Plaintiff believes that the Government obtained his Amazon purchase history contrary to legal process between September 8, 2025 and November 8, 2025.

## COUNT 11 – HARASSMENT, STALKING, | Title VII Civil Right Act, American with Disabilities Act, Fourth Amendment, Fourteenth Amendment

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff asserts that an undercover agent ("UCE-2") purposefully relayed information to him to trigger his mental health condition to cause emotional distress and trigger his anxiety.

## COUNT 12 - FALSE IMPRISONMENT, ARREST, and ILLEGAL DETENTION | FOURTH AMENDMENT

Plaintiff re-alleges the allegations in paragraphs from 1 - 123.

Plaintiff was approached by security and taken into a room off to the side. He was in the corner of the room in a position that made him feel like he was not free to leave.

Plaintiff alleges that this was done on behalf of the Government as AI-1 had previously been overheard by Plaintiff suggesting that it was better when Plaintiff was on leave.

Plaintiff was effectively seized and lost his freedom the moment Plaintiff was told by Amazon security, on the behest of Government agents, that he was not free to leave and get water.

## COUNT 13 – ILLEGAL SEARCH AND SEIZURE VIA OF CELL SITE SIMULATOR | FOURTH, FIFTH, AND EIGHTH AMENDMENT

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff had his keys on his desk at the Amazon building located at 55 Pier 4 Blvd, Boston, MA 02210 on August 13, 2025.

3. Plaintiff re-states that he used the key at a bicycle rental terminal after walking out of the south station train station and it went missing when he was in his office. When the plaintiff found the key at the train station, he was told it was on a trolley which did not make any sense because he wouldn't have had the key fob to rent the bike.

4. Plaintiff asserts that his keys were taken without authorization by an unknown defendant agent of the FBI.

## COUNT 14 – HARASSMENT, STALKING, | Title VII Civil Right Act, American with Disabilities Act, Fourth Amendment, Fourteenth Amendment

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff asserts UCE-1 sarcastically telling Plaintiff that he's sure they will meet again and he will introduce him to the neighbors was an effort to mean he will eventually be arrested, intended to harass and damage his wellbeing.

## COUNT 15 – OBSTRUCTION OF JUSTICE / PLANTING EVIDENCE | Title VII Civil Right Act, American with Disabilities Act, Fourth, Fifth, Sixth, and Fourteenth Amendment

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff asserts that the Government made an effort to plant evidence on Plaintiff's cloud account ("Google Account") by linking clacroix@gmail.com to explicit adult groups on August 14, 2025.

## COUNT 16 – OBSTRUCTION OF JUSTICE / PLANTING EVIDENCE | Title VII Civil Right Act, American with Disabilities Act, Fourth, Fifth, Sixth, and Fourteenth Amendment

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff asserts that the Government made an effort to maliciously frame Plaintiff as a disgruntled employee of Amazon.

3. Through the use of T.C., a Business Analyst at Amazon and confidential human source, the FBI had him manipulate Plaintiff into stealing data without him knowing through the guise of testing a file he made on August 13, 2025.

## COUNT 17 – OBSTRUCTION OF JUSTICE / PLANTING EVIDENCE | Title VII Civil Right Act, American with Disabilities Act, Fourth, Fifth, Sixth, and Fourteenth Amendment

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff asserts that the Government made an effort to maliciously frame Plaintiff as a disgruntled employee of Amazon.

3. Through the use of T.C., a Business Analyst at Amazon and confidential human source, the FBI had him manipulate Plaintiff into stealing data without him knowing through the guise of testing an Excel file later found to be malicious.

## COUNT 18 – ILLEGAL SEARCH AND SEIZURE due to UNAUTHORIZED ENTRY INTO HOME | FOURTH AMENDMENT

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff asserts that the Government made unauthorized entry into his home located at 680 Worcester Street, Wellesley, MA on July 15, 2025 while the entire family was out at a naturalization ceremony.

## COUNT 19 – ILLEGAL SEARCH AND SEIZURE due to UNAUTHORIZED ENTRY INTO HOME | FOURTH AMENDMENT

1. Plaintiff re-alleges the allegations in paragraphs 1 - 123.

2. Plaintiff asserts that the Government made unauthorized entry into his home located at 680 Worcester Street, Wellesley MA on July 25, 2025 during the execution of a fire alarm.

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Plaintiff requests a temporary restraining order against Defendants prohibiting all involved federal agents and their use of third parties from conducting any form of physical surveillance or undercover operation which may jeopardize his mental health. Physical surveillance shall include any person, walking, running, biking, or driving within an area that the Plaintiff himself can see or physically access.

Plaintiff also requests that the Government immediately cease the act of having drone's follow Plaintiff as he has observed them constantly for the last two weeks.

The Plaintiff at a later time prays for a preliminary injunction barring the government from repeating any similar surveillance practice itself or through a third party for the remainder of the Plaintiff's life unless Plaintiff is determined to no longer to be prone to depression, anxiety, and psychosis.

The Plaintiff seeks $1,000,000.00 for the emotional distress and damage done to his mental health. Plaintiff took several weeks off from work for rest and had to extend it to seek professional treatment following the discovery of the alleged hacking by the Government.

Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:
12/7/2025      12/7/25.

Signature of Plaintiff

Printed Name of Plaintiff

Cameron LaCroix

### B.    For Attorneys

N/A

Addendum missing from Complaint Background

The Plaintiff was on Leave of Absence from Amazon between September 5 and November 20, 2025. While researching the existence of the malware placed on his company laptop he discovered that his laptop had artifacts on it related to pornography. Plaintiff alerted his manager, HR, and Corporate Security about the registry key which stated "Brazzers", the name of an adult site.

Plaintiff upon returning to work, which commenced on November 24, 2025 as he used PTO on November 21, 2025, visited the IT department and asked for his computer to be re-imaged, which they did. Plaintiff contents that his laptop used to belong to M.C., an Area Manager at the Taunton AMXL delivery station that he worked at. Plaintiff knows that M.C. was terminated for viewing porn while at work and for sexually harassing a young female associate. The encounter was reported by M.L., another manager who had eventually resigned from Amazon.

Plaintiff swears this is the truth under penalty of perjury,

Cameron Lacroix

12/7/25