Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

|  |  |  |  |
|---|---|---|---|
| CAMERON LACROIX | ) | Case No. | 25-cv-13452 |
| *Plaintiff(s)* | ) | | |
| -v- | ) | | Jury Trial Demanded |
| BRETT LEATHERMAN et. al. | ) | | |
| *Defendant(s)* | ) | | |

## SECOND AMENDED COMPLAINT FOR A CIVIL CASE

### I.  The Parties to This Complaint

#### A.  The Plaintiff

| | |
|---|---|
| Name | CAMERON LACROIX |
| Street Address City | PO Box 620144, Newton |
| and County State | Middlesex, MA |
| and Zip Code | 02462 |
| Telephone Number | 617-539-6662 |
| E-mail Address | cameronlacroix@proton.me |

#### B.  Defendants

**Defendant No. 1**

| | |
|---|---|
| Name | BRETT E. LEATHERMAN |
| Title | Assistant Director of FBI Cyber Division |
| Street Address City | 935 Pennsylvania Ave NW, Washington |
| and County State | District of Columbia |
| and Zip Code | 20535 |
| Telephone Number | 202-324-3000 |
| E-mail Address | BELeatherman@fbi.gov |

1

Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

**Defendant No. 2**

| | |
|---|---|
| Name | TED E. DOCKS |
| Title | Special Agent In Charge of FBI Boston |
| Street Address City | 201 Maple St, Chelsea |
| and County State | Suffolk, MA |
| and Zip Code | 02150 |
| Telephone Number | 857-386-2000 |
| E-mail Address | UNKNOWN |

**Defendant No. 3**

| | |
|---|---|
| Name | KIMBERLY MILKA |
| Title | Assistant Special Agent In Charge of FBI Boston |
| Street Address City | 201 Maple St, Chelsea |
| and County State | Suffolk, MA |
| and Zip Code | 02150 |
| Telephone Number | 857-386-2000 |
| E-mail Address | UNKNOWN |

**Defendant No. 4**

| | |
|---|---|
| Name | ANDREW BAILEY |
| Title | Co-Deputy Director of FBI |
| Street Address City | 935 Pennsylvania Ave NW, Washington |
| and County State | District of Columbia |
| and Zip Code | 20535 |
| Telephone Number | 202-324-3000 |
| E-mail Address | UNKNOWN |

**Defendant No. 5**

| | |
|---|---|
| Name | UNKNOWN DEFENDANT AGENTS |
| Title | Special Agent of Other Agency/Task Force Officer |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 6**

| | |
|---|---|
| Name | UNDERCOVER AGENT 1 ("UCE-1") aka B.M. |
| Title | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |

2

| | |
|---|---|
| E-mail Address | UNKNOWN |

**Defendant No. 7**

| | |
|---|---|
| Name | UNNAMED DEFENDANT AGENTS. |
| Title | Special Agents, FBI |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |

**Defendant No. 8**

| | |
|---|---|
| Name | AGENT-1 (cited in COUNT 7) |
| Title | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 9**

| | |
|---|---|
| Name | AGENT-2 (cited in COUNT 7) |
| Title | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 10**

| | |
|---|---|
| Name | AGENT-3 (cited in COUNT 7) |
| Title | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 11**

| | |
|---|---|
| Name | AGENT-4 (cited in COUNT 8) |
| Title | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 12**

| | |
|---|---|
| Name | AGENT-5 (cited in COUNT 8) |
| Title | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 13**

| | |
|---|---|
| Name | UNDERCOVER AGENT 2 ("UCE-2") aka JOE. |
| Title | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 14**

| | |
|---|---|
| Name | UNDERCOVER AGENT 3 ("UCE-3") aka R.M. |
| Title | Special Agent |
| Street Address City | UNKNOWN |
| and County State | UNKNOWN, MA |
| and Zip Code | UNKNOWN |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

**Defendant No. 15**

| | |
|---|---|
| Name | DAVID G. NANZ |
| Title | Assistant Director of FBI Operational Technology Division |
| Street Address City | 935 Pennsylvania Ave NW, Washington |
| and County State | District of Columbia |
| and Zip Code | 20535 |
| Telephone Number | 202-324-3000 |
| E-mail Address | UNKNOWN |

**Defendant No. 16**

| | |
|---|---|
| Name | UNDERCOVER AGENT 4 ("UCE-4") aka Philippe |
| Title | Special Agent |
| Street Address City | 1 Justice Way, Dallas |
| and County State | Texas |
| and Zip Code | 75220 |
| Telephone Number | UNKNOWN |
| E-mail Address | UNKNOWN |

Pro Se 1 (Rev. 09/16) Complaint for a Civil Case

## II.    Basis for Jurisdiction

### A.  Federal Question

This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case presents a federal question under the United States Constitution. This action is brought pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), against Defendants in their individual capacities. At all relevant times, Defendants were officers, employees, agents, or deputized task force officers of the Federal Bureau of Investigation ("FBI"), a federal agency, who acted under color of federal authority. Plaintiff's claims arise from Defendants' unconstitutional conduct and he seeks damages for violations of his federally protected rights applicable but not limited to the acts and clauses herein:

4th Amendment (Unlawful Search & Seizure)

5th Amendment (Self Incrimination)

6th Amendment (Right to Fair & Impartial Trial)

8th Amendment (Cruel & Unusual Punishment)

14th Amendment (Due Process)

American with Disabilities Act (ADA)

Title VII Civil Rights Violations

### B.  Venue

Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 as multiple Defendants reside within the District of Massachusetts. The actions described in

The Amount in Controversy

Plaintiff asks that he be compensated with $1,000,000.00 as emotional distress, loss of wages, court fees, medical bills, and the numerous constitutional violations set forth below.

## III.    Statement of Claim

## SECOND AMENDED COMPLAINT

Plaintiff Cameron Lacroix brings this Complaint seeking damages against Defendants for carrying out psychological warfare against him and taking steps to advance an undercover mission at the expense of his mental health. Dozens of agents have participated in various events to include computer hacking, harassment, evidence planting, and stalking. Furthermore, Plaintiff asserts that the federal agents utilized multiple confidential informants throughout a multiyear investigation based on false pretenses. At least one of those confidential human sources was used to gain insight into his mental state rather than utilize legal processes for protected material under HIPAA. Defendants are charged in their individual capacities for violating Plaintiff's constitutional rights and these allegations should not be considered under the Federal Tort Claims Act. Plaintiff's tort claim to the FBI was mailed on November 23, 2025 and received at the DOJ's Tort Division's Mailbox on December 1, 2025. *(see USPS.com Tracking No. 9507106591065327425490)*. FTCA claims will be raised after the passage of 6 months or their denials.

## RESIDENCE AND WORKPLACE OF PLAINTIFF

Plaintiff was incarcerated for a violation of supervised release for a 21-month period running from July of 2019 until April of 2021. He spent the last 60 days of that sentence in the Coolidge House which is a Residential Reentry Center ("RRC") located in Boston, Massachusetts. He was hired by Amazon as a Part Time Grocery Shopper on April 3, 2021 and consistently worked two jobs which included Clover Food Lab and Target until October of 2021. At that time he was promoted into a full-time position at an Amazon warehouse in Dedham, MA. He maintained an exemplary performance record, never received any formal coaching, and was promoted several more times until he landed his current role as a Program Manager. He was suspended indefinitely on December 5, 2025 after being interrogated by Amazon Security related to a confidential investigation. Plaintiff does not hold a college degree despite being in a role that typically requires one.

Plaintiff lived with his family at 680 Worcester Street Apt 101 in Wellesley, MA from April 1, 2025 until November 7, 2025. Plaintiff's spouse walked out on September 16, 2025 and gradually moved her belongings with the help of Plaintiff and some church friends. Plaintiff now resides alone at 270 Grove Street Apt 6 in Auburndale, MA and his spouse elsewhere.

## **ALLEGATIONS**

1.   The Federal Bureau of Investigation is aware of the fact that Plaintiff has a history of mental health issues and is currently involved in treatment as he's been under constant physical surveillance. In 2014 the Plaintiff agreed to provide his presentence investigation report ("PSR") to the FBI's Behavioral Analysis Unit ("BAU") synonymous with his conviction on various computer offenses *(see United States v. Lacroix, 14-CR-10162-MLW, District of Massachusetts)*. The PSR informed the Court and FBI that he struggled with anxiety, depression, and substance abuse. During this time Plaintiff engaged in a very serious criminal act by repeatedly hacking into law enforcement servers to determine whether he was under investigation *(see PSR pg.5 at 12-13)*. The document PSR, authored by U.S. Probation, contained Plaintiff's admission that substances made him so paranoid that he thought law enforcement officials were following him *(see PSR pg. 20 at 75)*.

2.   Plaintiff has reviewed a public copy of the Attorney General's Guidelines on FBI Undercover ("UC") Operations dated May 30, 2002. The first step under Section IV discussing the authorization of UC operations states that "Any official considering approval or authorization of a proposed undercover operation…"," shall weigh", and "The risk of personal injury to individuals". Plaintiff asserts that these guidelines were not followed and Government agents acted negligently and in bad faith to not consider any risk to Plaintiff's mental health when working on the operations' application.

3.   For the last few months federal agents have taken steps to break, pressure, and provoke Plaintiff by authorizing invasive, intensive, and obvious physical surveillance. The Government's risky techniques nearly emulated the scenario from 2012 which cost the Plaintiff a psychotic episode resulting in his admission into an Emergency Room and Crisis Center. Plaintiff prays that the Court hold Defendants accountable for negligently authorizing and engaging in an undercover operation designed to compromise his wellbeing. Finally, Plaintiff charges that the Government's actions led Plaintiff into believing that his liberty was restricted at certain points in time as there have been more than 50 agents surveilling him at one location, while on road, and in Amazon's Boston Office where he works.

4.   Plaintiff mentions that the Government is trying to destroy his life. In this unusual case Plaintiff claims that unknown agents hacked Plaintiff's wireless network over the summer and intruded into his apartment which both contributed to the breakdown of the relationship between him and his wife. He has been harassed, insulted, and intimidated just days after he mentioned this suit on social media on November 10, 2025. The Plaintiff's mental health issues were in full remission until the discovery of some of the Government's hacking and intensive physical surveillance.

5.   On November 17, 2018 Plaintiff was serving a term of supervised release and he had resigned from his place of employment. He notified his Probation Officer about his resignation 13 days later on November 30, 2018. His conditions included a stipulation requiring him to install monitoring software on any device he uses because of prior hacking charges.

6.   On December 4, 2018 Plaintiff's Probation Officer visited his residence, threw paperwork down on his table, and yelled at him for quitting his job without telling him within the 10 day limit. The officer pointed to a computer that was in his home and asked about it. Plaintiff told the officer that it was the computer he emailed him just a few days earlier and he understood that the officer would install the software on it today. The officer asked him how long it had been turned on and Plaintiff told him that he turned it on two hours ago in anticipation of the officer's arrival.

7.   On December 6, 2018 Plaintiff's officer send a memo to the Court falsely indicating that Plaintiff admitted to surfing the web without monitoring for two hours and that Plaintiff was warned about what continued non-compliance would result in.

8.   On Decmeber 8, 2018 Plaintiff was forwarded an e-mail by mistake which indicated that his officer talked to his supervisor about arranging a "game plan" as to what to do with Plaintiff. He also suggested that they haul him into court for an administrative hearing despite telling the Judge in his memo that they recommended no action.

9.   On January 22, 2019 Plaintiff handed a letter to the court clerk which then reached the Chief Judge at the time stating that his officer misled the Court. Plaintiff claimed that the officer switching his words around, harassed him, and had never coached him about future violations as the officer's report stated. Plaintiff also owed restitution for his last criminal conviction and noted that his officer had made a deal with him where he'd allow him international travel in exchange for paying more money. Within 24 hours U.S. Probation contacted the U.S. Attorneys Office who had the FBI open an investigation into Plaintiff.  U.S. probation then petitioned the Court to terminate his supervision and have him incarcerated.

10.  In February of 2019 an FBI Special Agent requested a search warrant for Plaintiff's cell phone records. Despite swearing to a federal judge that the facts she had presented were true, the affidavit contained recklessly false statements such as alleging that Plaintiff once worked at a helpdesk company and that he had abused his position to hack them. Plaintiff never worked at a helpdesk company nor was he convicted for abusing a trusted position. This affidavit was never provided to the Plaintiff at the time of his violation and he received it six years later after successfully having the records unsealed.

11.  Plaintiff went to trial on the violations in April of 2019 and learned that 8 of his drug tests tested tested positive for fentanyl but the Government did not charge all of them. Seven of the eight samples proved up to actually be negative upon follow up testing. Plaintiff felt that the Government was working to manufacture charges against him after being told that he failed a drug test he provided in December 2018. To protect himself he had started going to a lab and paying for his own test each time he would visit the Probation Officer. Unfortunately Plaintiff was found in violation for the single failure he did not have his own test for.

12.  In July of 2019 Plaintiff self-surrendered to FMC Devens in Ayer, MA to begin serving a sentence for his revocation. Prior to the surrender Plaintiff had been told by his lawyer that the Government would not prosecute him.

13.  In February of 2021 an FBI agent contacted another FBI agent via e-mail concerning the Plaintiff. While the documents in Plaintiff's possession were heavily redacted, some of the contents indicated that agents wasting no time in continuing to target him despite completing his sentence. In March of 2021 a Special Agent interviewed someone over the phone about Plaintiff.

14.  On April 3, 2021 Plaintiff was hired by Amazon as a Part Time Whole Foods Shopper. He was also employed full time at Target based in Watertown, MA until moving to a driving role with Clover Food Lab in Cambridge, MA.

15. On April 5, 2021 Plaintiff discharged from Bureau of Prisons custody and moved into the apartment he had lived in with his spouse since February of 2019. U.S. Probation assisted with the installation of internet monitoring software as it was a requirement of supervised release which remained in effect until his discharge in January of 2023. This software captured all activity on the screen and acted as a key logger. Plaintiff never changed his passwords and this information was freely available to the Government.

16. On November 4, 2021 Plaintiff emailed his attorney stating that his U.S. Probation Officer wanted to polygraph him and he was concerning that they would ask questions related to his 2019 supervised release violation, potentially triggering prosecution. While the polygraph was eventually called off, U.S. Probation told Plaintiff that there was a conversation between him and a former hacker where it appeared that Plaintiff wanted to get back to hacking. Plaintiff told his Probation Officer that he didn't recall that and if he was serious then he certainly would have. The conversation was never shown to Plaintiff and the polygraph request had been rescinded.

17. Towards the end of December 2021 or early January 2022 Plaintiff reported to work at Amazon and was greeted by a Loss Prevention Specialist known by the initials K.E. K.E. was sitting down in front of the workstation Plaintiff needed to use in order to punch in and he asked if he could please move so he wouldn't flag as being late. K.E. apologized, moved, and told Plaintiff he was investigating gift card fraud involving some drivers. K.E. asked Plaintiff if he could use Amazon's system to research the gift card numbers if he provided them. Plaintiff said he was not comfortable doing so and told K.E. that he could sign in to the system and do it himself. Plaintiff remarked that Amazon policy didn't allow favors like that and K.E. said no problem, adding that he has one of these computers at his house and it's a gold mine of information. Plaintiff felt anxious as if he was being judged due to his criminal past and told to carry on with his day.

18. On or around January 2022 a suspicious gmail.com account shared files with the Plaintiff's Google Drive account. These files consisted of confidential email files which appeared to show details related to a specific employee's leave of absence which would only be visible to someone working for their Human Resources department. Plaintiff recalled finding these around September 2025 when he was looking for signs of an intrusion into his Google Account following unauthorized access alerts. Plaintiff deleted the messages around this that time.

19. On September 27, 2024 an undercover agent ("UCE-3") known by the initials R.M. was arrested by Wellesley Police for OUI-LIQUOR OR .08% c90 s24(1)(a)(1) and ABUSE PREVENTION ORDER, VIOLATE c209A s7. According to Dkt. No. 2454CR0012** (Partially Redacted) he spent the weekend in the Dedham House of Correction and was released by the Dedham District Court on September 30, 2024.

20. On October 1, 2024 the Dedham District Court allowed the Commonwealth's motion to revoke UCE-3's release and was again incarcerated at the Dedham House of Correction.

21. On November 1, 2024 UCE-3 was released on conditions after spending 30 days in the House of Correction. The stipulations included a GPS monitoring bracelet along with an order to stay out of the Commonwealth of Massachusetts

22. On March 27, 2025 UCE-3's conditions were modified to include stay away from court ordered location, no contact with the victim/witness, and still -- GPS monitoring.

23. On April 1, 2025 Plaintiff moved into 680 Worcester Street in Wellesley, MA with his family. During this month UCE-3 had also moved in to 680 Worcester Street in Wellesley. UCE-3 introduced himself to Plaintiff and asked where he worked, how much he made, is his unit subsidized, and how much he pays. During a subsequent conversation UCE-3 also conveyed that his wife was a b***h for taking his house and kids away. He stated they were working through a divorce.

24. On April 13, 2025 Plaintiff transferred his cell service to Visible by Verizon Wireless because of issues with his Mint Mobile cellular service. For multiple months his cell service was consistently being

reduced to 2G/EDGE service. Plaintiff cannot substantiate the claim that the Government caused this but notes that Government utilized cell site simulators have the ability to intercept the content of calls and texts while operating on the 2G protocol.

25. On May 5, 2025 UCE-3 pleaded to sufficient facts and was sentenced to a term of probation.

26. On May 31, 2025 Plaintiff reached out to the Wellesley Police's Records Secretary Cheryl Carlson asking for UCE-3's police report because of inappropriate comments that he had made to he and his daughter S.J. Plaintiff's daughter said that UCE-3 would always try to talk to her when she would be outside practicing volleyball and Plaintiff felt he was being overly intrusive towards her. Plaintiff learned of the arrest based on a Google search and recently noticed that it was scrubbed from the internet at some point probably because agents observed the e-mail in Plaintiff's Google Mail account later on.

27. On June 9, 2025 Plaintiff switched back to Mint Mobile in order to receive a discounted phone and cellular plan. Plaintiff eventually began having issues with Verizon's Visible network where he would encounter many dead zones despite being in urban areas.

28. On June 11, 2025 Plaintiff commuted to work by way of the Wellesley Square Commuter Rail to South Station. At 10:32 AM Plaintiff used his BlueBikes rental key fob to rent a bicycle at 10:32 AM. Once arriving near his office he realized he left his keys inside of the BlueBikes kiosk. He travelled back to South Station and they were not able to be found anywhere. He utilized the BlueBikes Mobile App to then return to work.

29. On June 11, 2025 Plaintiff called BlueBikes and cancelled his fob so it could not be used. Around 5:29 PM Plaintiff had received a voicemail indicating that a government employee had possession of his keys and that they would turn them in to Boston City Hall the next day. At 10:26 AM Caleb Bove of Boston's Transportation Department stated that he had the keys and it was later learned that the keys were actually given to another employee named Louisa who had then gave them to Caleb. These keys contained Plaintiff's key fob to his home.

30. On or around June 13, 2025 Plaintiff began working on documents related to the sealing of his past state criminal convictions to help overcome barriers faced surrounding his criminal history.

31. On June 30, 2025 Plaintiff submitted several FOIA requests to various federal agencies to obtain records. Plaintiff requested these records in furtherance of writing a life story the following year to help those avoid similar situations he's experienced.

32. On July 5, 2025 Plaintiff sent an e-mail to the U.S. Attorney's Media representative for the District of Massachusetts requesting the removal of a 2019 press release concerning a supervised release violation which appeared to be prejudicial *(See https://www.justice.gov/usao-ma/pr/recidivist-hacker-sentenced-violating-supervised-release-conditions)*. Plaintiff's e-mail noted that hiring managers mistakenly believed that he had an additional conviction which caused him to be passed up for several jobs and at least two apartments (apartments not cited in e-mail). Plaintiff sent the e-mail from his student e-mail account with Western Governors University. A similar e-mail was also sent to the U.S. Attorney for the District of Massachusetts known as "L.F." and her assistant. and had sent a similar e-mail to the U.S. Attorney for the District of Massachusetts. . He also sent an e-mail directly to the U.S. Attorney for the District of Massachusetts and assistant to ensure the request was reviewed.

33. On July 14, 2025 Plaintiff received an e-mail from Stephanie Parkhurst who is the realtor with J. Derenzo Properties LLC, his property manager. Stephanie asked that Plaintiff fill out an IRS form that would be used to record their security deposit. Plaintiff was wondering why this was necessary but filled out the form anyway.

34. On or about July 15, 2025 Plaintiff went to his office and dropped off his belongings in order to head over to his wife's naturalization ceremony. Plaintiff left his office and met his family several blocks from the John Joseph Moakley Federal Courthouse in Boston which was within walking distance. Plaintiff and his family all turned their cell phones into the U.S. Marshal at the front desk. Plaintiff noticed that a man named Philippe ("UCE-4") who was known to him as a Program Manager employed

by Amazon was also there. It was later learned that Philippe is a Special Agent based out of Texas supporting a botched investigation to frame Plaintiff with false charges. Plaintiff alleges that Philippe was there to monitor Plaintiff and keep track of their location while Government agents made illegal entry into Plaintiff's home and/or tampered with his phone.

35. On July 19, 2025 a laptop within the Plaintiff's household began transmitting personal files to an external server without authorization. The files that were transmitted included photos of his family, their application for subsidized housing, immigration applications, tax and financial information, and the logins and passwords to Plaintiff's brokerage accounts. This information was learned several months later after Plaintiff took part in a forensic review of the computer which was unfortunately cut short after it malfunctioned.

36. On July 25, 2025 a fire alarm went off in Plaintiff's home while he was at work and his family was forced to exit. During this time, Plaintiff believes that the Government made unauthorized entry into his home to tamper with electronic devices.

37. On July 26, 2025 Plaintiff met an individual known as M.L. who he knew to be an FBI confidential human source ("CHS-2"). During this meeting said that he was not engaged in crime any longer and proudly had become a family man. Plaintiff later began to feel uncomfortable after M.L's associates asked Plaintiff to join them in hooking up with women later. Plaintiff declined stating that he was married.

38. In July of 2025 Plaintiff's workstation was directly to the left of an individual known by the initials A.T. The employee told Plaintiff on one occasion not only that he was an immigrant from Lebanon but that he "would do anything for a green card". At some point A.T. slowly began befriending Plaintiff by providing him with a Shake Shack sandwich without anything in return, snacks, and a beer or two during several work outings. Plaintiff viewed this as an act of kindness.

39. A.T. repeatedly told Plaintiff that he was stressed out from work being heavy and Plaintiff had himself been overloaded too. Plaintiff recalled telling A.T. that it's just the way it is and agreed that it was stressful. Plaintiff also told him and others in the office that his manager had left her position and the role would not be re-filled. A.T. at times would randomly tell Plaintiff "f*** Amazon man" and Plaintiff reluctantly said things such as "yeah man it's a lot" or "yeah f*** this". Plaintiff however did not feel ill-will towards the company and was merely trying to let A.T. know that he was being heard by someone. Plaintiff also heard the same from the individual positioned directly to his left known as Y.T., a Technical Program Manager with Amazon who later transferred to a Robotics team. These interactions however were not vulgar based on Plaintiff's recollection nor were his responses. Plaintiff believes that Y.T. and A.T. were both acting to egg Plaintiff on in order to produce incriminating statements even though Plaintiff's statements were merely to offer them a sense of acceptance. Plaintiff asserts that this was manipulative and harmful to his mental health due to deception.

40. On a date between June 15, 2025 and August 31, 2025 Plaintiff was at his residence located at 680 Worcester Street and entered the front lobby. Plaintiff observed a bank card placed in the center of a table and picked it up to read the name. Plaintiff placed it back on the table and now believes that this was a scheme to entice or entrap Plaintiff as undercover agents were already occupying multiple apartments in his building.

41. On July 29, 2025 a Duty Attorney responded to Plaintiff's request to remove the prejudicial article saying that they are meant to remain permanently or at a minimum 15 years.

42. In early August 2025 T.C., a Business Analyst with Amazon and colleague of Plaintiff approached his desk to strike up a conversation. T.C. told Plaintiff that he was thinking about having his wife work for Amazon but was concerned that it would be unethical because he works on our labor programs. Plaintiff told T.C. that his own wife works for Amazon and all he had to do was just make sure he followed the proper channels. Plaintiff told T.C. that he received clearance from his direct manager and PxT (HR) before having her apply.

43. On August 4, 2025 a computer used by an UNKNOWN DEFENDANT AGENT accessed Plaintiff's wireless network without authorization.

44. On August 7, 2025 Stephanie Parkhurst of J. Derenzo Properties e-mailed Plaintiff an addendum related to their lease, asking for a signature. The addendum contained clauses indicating that Plaintiff could not hold the Owner liable for any wireless interception that occurred on the property if wireless was provided locally. It also contained an additional clause stating that no unit shall embark in any type of sound or audio recording. Plaintiff signed the agreement while his spouse did not, but the date appeared to only cover August 7, 2025 on. Plaintiff did not notice these strange additions and merely signed away.

45. On August 13, 2025 Plaintiff commuted to work using the Wellesley Square Commuter Rail. Upon arriving at South Station, he exited the terminal and rented a bicycle using the fob on his key chain at 1:37 PM.

46. On August 13, 2025 Plaintiff was at work when a colleague known as T.C., believed to be working at the direction of an Internal Amazon Investigator ("AI-1"), walked over to his desk. He asked Plaintiff if he could test out an Excel file. Plaintiff opened the file without question and it furtively used his credentials to sign in to a database that he did not have any authorization to access. Plaintiff's account then extracted time card and pay details related to hundreds of Amazon employees in his organization.

47. On August 13, 2025 at 6:11 PM Plaintiff realized that his keys were missing from his desk area. Plaintiff was able to rent a bike at 8:53 PM which he rode to South Station using the BlueBikes app since he no longer had his rental fob.

48. On August 14, 2025 a sexually explicit message was sent to Plaintiff's Google Account clacroix@gmail.com using Google Groups. The message said in part "Invitation to join SexAre you in a Relationship?" and indicated it was an exclusive adult community. Plaintiff did not initiate this request.

49. On August 14, 2025 Plaintiff retrieved his keys late afternoon from the South Station Terminal's Lost and Found. Plaintiff was told that a conductor found the keys on a train which was unusual because he had it when he checked out a rental bike a day prior on his way into the office. After receiving his keys he then boarded a train and headed home.

50. On August 15, 2025 a computer used by an UNKNOWN DEFENDANT AGENT had accessed Plaintiff's wireless network without authorization.

51. On August 23, 2025 through August 30, 2025 Plaintiff was actively trading crypto and trying to turn a profit. During this time period Plaintiff repeatedly vented to his wife that his phone was acting slow and it caused him to lose several thousands of dollars due to sell orders not going through such the $NEON coin which experienced a strong inflation in it's price.

52. On August 30, 2025 Plaintiff received an e-mail from Google indicating that someone tried to access his account from another device.

53. On August 31, 2025 Plaintiff discovered that a sophisticated rootkit had been installed on a computer in his household and told his wife that someone could steal everyone's identity.

54. On September 1, 2025 Plaintiff arrived at work and followed his normal pattern of travelling to the 7th floor to get coffee. While waiting for his cup to be brewed an unfamiliar face behind him struck up a conversation about the coffee machine, admiring how nice it was but then saying that it sucked that it took so long. One day prior Plaintiff had made a post on social media joking about how much more work he could do if the coffee brewed faster. Plaintiff did not make this connection right away.

55. On September 2, 2025 Plaintiff noticed that his phone was lagging a lot and displaying different looking version of commonly used websites such as X.com and LinkedIn. While using LinkedIn the Plaintiff kept being redirected to profiles of people that he had seen while out in public somewhere, including inside of his Amazon office. Plaintiff reverse image searched one of the and was led to a Google result that turned out to be a whistleblower document that had been uploaded to the Nuclear Regulatory Commission's website. Plaintiff took note of this finding as it looked like highly sensitive information that should not be public so he could report it at a later date.

56. On September 3, 2025 at 6:32 AM Plaintiff could not use his cell phone's brokerage apps nor social media as they were displaying faulty overlays. Faulty overlays are a feature of sophisticated malware that lets an attacker gain unauthorized access to an account where the user enters his or her details into a fake username and password field. He decided to finally try a factory reset and had to receive a new eSIM card number in order to complete the transfer of his account back into the phone's memory.

57. On September 3, 2025 at 9:32 AM Plaintiff again noticed that his phone was being remotely controlled by an attacker. He again factory wiped the phone and obtained a new eSIM card number.

58. On September 4, 2025 at 5:36 PM Plaintiff contacted Western Governors University's IT Department by phone to report an inability to access his school's account and Gmail. Plaintiff now knows that he was not able to sign-in to his account due to an advanced law enforcement technique which restricted some features of the web browser. For example, Plaintiff was not able to utilize the Incognito browser which ensures cookie files are not retained. Plaintiff was eventually able to sign-in after not using the Incognito (private browser) and believes the malware did this deliberately so it could capture keystrokes. This malware also negatively influenced the social media feed of Plaintiff's LinkedIn account and caused it to inflict psychological damage to Plaintiff.

59. On September 5, 2025 at 6:25 PM the Plaintiff noticed that there were a lot of cigarette butts being left beside his car. Upon looking up at the building he determined that the window belonged to Unit 105 which was later determined to be an apartment being utilized for the undercover operation. While it was not known at the time, he sent photos to his property manager because he didn't want to be blamed for violating the strict no smoking policy.

60. On September 5, 2025 Plaintiff received an e-mail from X.com indicating that his social media account was accessed from another device which was unexpected.

61. On September 5, 2025 Plaintiff suffered a panic attack and told his wife that he felt like someone wanted to hurt him and he didn't know why. Plaintiff's wife helped calm him down and the two went outside for a walk. Upon exiting the residence and going out into a nearby field the Plaintiff and his wife prayed together in Sprague Field in Wellesley. Upon heading back to their residence the Plaintiff saw a drone directly above his home at a very low altitude, roughly 20 feet above the building.

62. On September 5, 2025 Plaintiff spoke to his direct manager at Amazon L.G. as well as his HR contact A.G. about some mental health challenges. He requested a three week leave of absence immediately so he could work on his relationship with his spouse, grieve about a death in the family, and work on his mental health as he was exhausted. It was approved.

63. On September 6, 2025 Plaintiff e-mailed his mentor at Western Governors University asking about the possibility of Two Factor Authentication being added to his student account. Plaintiff reported that a computer in the household was infected with a rootkit and he was concerned about his credentials being stolen. Plaintiff also noticed that his school's Google Account had been restricted where his free space had been reduced to zero.

64. On September 6, 2025 Plaintiff's laptop would no longer start after attempting to reboot it. This occurred after he had backed up some artifacts which resembled evidence of unauthorized access and malware.

65. On September 7, 2025 Plaintiff reported to Amazon that he had also discovered malware on his work laptop as he was concerned that confidential information might fall into the wrong hands. The matter was escalated to AWS' Corporate Security team who then restricted his laptop from accessing internal resources.

66. On September 8, 2025 a sexually explicit invitation was sent to Plaintiff's Google Account clacroix@gmail.com which read in part "Invited you to join Private Room Only For Naughty Minds". Plaintiff did not initiate this request.

67. On September 12, 2025 Plaintiff purchased a new laptop from a Wal-Mart to replace the one that malfunctioned after infection.

68. On September 14, 2025 Plaintiff interacted with two individuals that were moving out of 680 Worcester Street Unit 104 in Wellesley, MA and observed that all of their belongings being taken out by movers. Plaintiff spoke with a white male in the hallway who was accompanied by an Asian female. They appeared to be the owners of the unit and Plaintiff asked how long they had been there because he hadn't recognized them. The man told Plaintiff that they were there for three months.

69. On September 14, 2025 Plaintiff self-reported to the Newton-Wellesley Hospital's Emergency Room and was evaluated for symptoms of anxiety and psychosis. Plaintiff was accompanied by his spouse ("K.P." previously known as "I.P.") and his church pastor ("M.M."). Once admitted only his wife remained. Plaintiff saw multiple members of medical personnel and reported that he thought people were following him and worried that he'd be killed. At some point a man not wearing medical attire seized Plaintiff's bookbag and was told that it would be searched in another location. Plaintiff stabilized after a few hours and was released as he was not considered a danger to himself or others. Plaintiff was recommended to follow up with his provider and also look into services provided at Newton-Wellesley Hospital. Plaintiff's bag was later returned to him.

70. On September 15, 2025 Plaintiff believed that there may have been an unauthorized sign-in attempt made into his LinkedIn account based on login history.

71. On September 15, 2025 Plaintiff received an alert that someone in the central time zone utilized his Google credentials to activate Google's Timeline feature. Plaintiff did not enroll in Google Timeline and it is used to track all of the locations that someone has gone to. Plaintiff believes this was done by unknown Defendant agents who were using his credentials or controlling his phone with malware.

72. On September 16, 2025 UCE-3's criminal docket had an entry indicating that his OUI charged was removed and updated to SEALED.

73. On September 16, 2025 Plaintiff suffered a mental breakdown and accused his wife of being a spy which was completely false. Defendants hacked Plaintiffs devices and caused his LinkedIn feed to prioritize articles that mentioned Chinese spies seducing American men to get into the country as well. While Plaintiff's wife is not Chinese he had been pushed into a psychotic state which made him very susceptible to influential campaigns. Additionally, UCE-3 had previously asked Plaintiff if his wife was Chinese back in May of 2025 which was an odd coincidence. Plaintiff showed his phone to his father who saw the articles and then became concerned about his mental health.

74. On September 16, 2025 Plaintiff saw Nurse Practitioner Daisy S. at Boston Medical Center for symptoms of anxiety, depression, and schizophrenia. Plaintiff was evaluated and prescribed Effexor which treats symptoms of anxiety and depression based on a family member's success with it. The Nurse Practitioner said she was concerned about the schizophrenia diagnosis and processed a referral for psychiatry. She said that they would be the ones best equipped to support him.

75. On September 18, 2025 Plaintiff returned the laptop he purchased on September 12, 2025 to the customer service counter at the same Wal-Mart. While speaking with a cashier a man entered the store empty handed and headed directly to the returns counter to speak with Plaintiff. He asked Plaintiff why he returned the laptop and he said he had not used but did not like the appearance. The man told Plaintiff that he wanted the laptop and Plaintiff told him to ask the cashier who now had it in her possession. Plaintiff, visibly frustrated, apologized to the man for being aggressive and said that he was recently hacked and his life was turned upside down. The man told Plaintiff he worked in cyber security industry and asked about the intrusion. Plaintiff said he didn't know who had done it but that he thought it might be a Government such as the FSB and noted that his work machine had been infected too.

76. On September 20, 2025 Plaintiff logged into his household's wireless router provided by Xfinity which is when he initially discovered that the two unauthorized devices accessed the network using the correct password a month earlier. On August 4, 2025 an unknown individual used a computer to access

Plaintiff's wireless network without authorization. This computer identified itself using a local hostname of DESKTOP-JJK5S8E with a network MAC address of 104A7D0F4E70. On August 15, 2025 an unknown individual used a computer to access Plaintiff's wireless network without authorization. This computer identified itself using a local hostname of DESKTOP-T1KP1AQ with a network MAC address of 68342123FB63. According to macvendor.com both of these MAC addresses were manufactured by Intel Corporation and the Xfinity Gateway reported that each machine was running the Windows 10 operating system. Plaintiff believes all Defendants are responsible as well as unknown agents whom physically operated the computers.

77. On September 21, 2025 Plaintiff travelled to an Xfinity location in Natick, MA to exchange his modem. He met with one of their representatives and informed them that he was recently hacked and someone obtained his password without authorization. He was given a new modem but ultimately did not utilize it because he was not sure if he would be hacked again.

78. On September 21, 2025 Plaintiff tried to follow up with an OIG complaint concerning a negative DOJ press release using his e-mail account at Western Governors University. Plaintiff's e-mail bounced back with a message indicating that he was restricted from communicating with the OIG's domain ("usdoj.gov") e-mail address.

79. On September 22, 2025 Plaintiff's Fennel Brokerage account was accessed without authorization. Plaintiff spoke to Fennel's Account Support team who initially said they could not find any IP address despite the login notification coming to his e-mail. Account support followed up at a later time with an IP address that appeared to be a proxy server based out of California, not used by Plaintiff.

80. On September 22, 2025 Plaintiff reached out to his landlord asking if he could have a printout showing who had accessed their unit based on the key fob swipes. Their maintenance tech known by the initials D.D. told plaintiff he would provide them via a telephone call. Plaintiff reached out to D.D. via e-mail asking for the logs and was instead told that they would only provide it to law enforcement upon request. Plaintiff became increasing suspicious that his neighbors had something to do with the unauthorized entry due to limitations on how far his wi-fi could broadcast a signal. Plaintiff recalled leaving his apartment sometime after sending the e-mail and noticed that nearly every car in his parking garage had vanished which was unusual.

81. On September 23, 2025 or slightly earlier Plaintiff received an email from a hotmail.com account with the following message: "I am out of bathbombs. I will take $40 with please. At your convenience. Thank you, Margaret Smith". Plaintiff does not know this individual and believes this was an attempt to drop incriminating messages into the Plaintiff's mailbox, which may likely be subject to a search warrant, to advance a distribution investigation.

82. On September 24, 2025 Plaintiff posted to social media mentioning that internet capable devices in his household were hacked with malware which had the ability to manipulate his social media feeds to display negative news, transfer files, and enable session hijacking. Two employees of Amazon Web Services viewed Plaintiff's LinkedIn profile within a day of this post as well as several in other unknown departments also at Amazon.

83. On September 24, 2025 Plaintiff received a connection request from a man known by the initials D.N. who is a graduate of Western Governors which is the same school Plaintiff attends. D.N.'s profile indicates he is based out of New York and has an interest in the FBI's Cyber Division page.

84. On September 24, 2025 unknown federal agents deployed a cell site simulator which interfered with Plaintiff's ability to seek treatment following his Emergency Room visit. Plaintiff attempted to call the Newton-Wellesley Hospital's Substance Use Disorder clinic but the call continuously cut out multiple times. Plaintiff was only able to speak with a provider, known as Jasmine, without interruption by using Google Voice which relies on data rather than cellular routing. Between September 25 and September 30 Plaintiff's leave of absence was extended to November 20, 2025 upon his own request. Plaintiff was

struggling from on-going mental health challenges stemming from the Government's hacking campaign, phone jammers, and drone surveillance.

85. On September 30, 2025 Plaintiff advised his property manager that he could no longer manage paying the rent on his own as he and his wife were physically separated. Plaintiff requested to be out by November 1, 2025 but the property manager said it would be dependent on whether or not they could secure a new tenant. On October 28, 2025 Plaintiff's property manager said that they could not find someone and we would have to pay for November and now wait until December 1, 2025. Plaintiff experienced emotional and financial distress as he learned that other tenants such as Unit 104 and Unit 105 were allowed to vacate early without finding replacements. Plaintiff now believes he was likely denied exiting the lease because of pressure from Government agents running the undercover operation.

86. On October 2, 2025 Plaintiff left his apartment to go out and get takeout. Upon entering his parking lot area he observed a man with a dark colored hood near his vehicle. To the side of the man it looked like he had a cart that looked like a toolbox. Plaintiff was initially alerted and thought someone was trying to break into his car. Plaintiff rolled his window down and asked if he needed something once he turned his car on but the man said "nope". The location of Plaintiff's car was very close to the end of the lot and because there was soil to the right of him, it made very little sense for a man to be over there with a toolbox on wheels. Plaintiff believes this was an attempt to make him feel unsafe and he reached out to the property manager for help. They ultimately ignored his e-mail, likely due to pressure from the Government.

87. On October 6, 2025 Plaintiff listed a $200 Best Buy Gift Card on eBay obtained through a trade-in opportunity.

88. On October 6, 2025 Plaintiff received a forgotten password request from Frontline Education which he does not have an account with and did not initiate.

89. On October 7, 2025 Plaintiff was informed that the gift card had been purchased by a man residing in New York. Plaintiff received an eBay message from a separate account not associated with the purchase asking for the card number. Out of an abundance of caution and worrying that devices may still be hacked, Plaintiff cancelled the sale and refunded the payment.

90. On October 7, 2025 Plaintiff attended an appointment with his Primary Care Physician Dr. Jonathan B. at Boston Medical Center. Plaintiff was seen for symptoms of anxiety, depression, and schizophrenia. Plaintiff was evaluated and had his medication changed to Bupropion due to negative effects while on Effexor. Plaintiff's Primary Care Physician inquired about the psychiatry referral and thought it would be helpful for his mental health. He submitted a second referral for their Integrated Behavioral Health ("IBH") team which might be able to see him much sooner.

91. On October 12, 2025 Plaintiff asked Western Governors University's IT department about the space restrictions placed onto his Google Account which were noticed a month earlier. Plaintiff was told that this was unusual and that they would look into it.

92. On October 15, 2025 Plaintiff was told by Western Governors University's IT department to not worry about needing to use Google services and to rather use OneDrive instead. Plaintiff's support ticket was resolved.

93. On October 20, 2025 Plaintiff met with his Primary Care Physician Dr. Jonathan B. via a tele-med appointment. Plaintiff reported some progress with the medication but felt it was wearing off. Plaintiff's medication was increased to a higher dose. Plaintiff had not heard from any member of psychiatry and his physician said he would reach out to their management to get the ball rolling.

94. On October 27, 2025 Plaintiff met with a member of the IBH team at Boston Medical Center and completed an intake. Plaintiff's enrollment in IBH was in response to his complex mental health conditions and Plaintiff has been holding on to discussing core issues until this point. Plaintiff believes that the Government will try to manufacture additional evidence based on to the trauma he's experienced.

95. On October 29, 2025 the Plaintiff complained to Mint Mobile about constant interruptions to his service when placing calls close from his residence. The representative mentioned that others were having issues in the area and to rectify their tech team would try updating the software on the tower. The representative informed him that tower was very close and was found to be a repeater affixed to a utility pole directly in front of 680 Worcester Street in Wellesley, MA (Plaintiff's residence at the time).

96. On November 1, 2025 Plaintiff departed 680 Worcester Street in the early morning hours to pick up the keys to his new unit 270 Grove Street in Auburndale. After retrieving the keys Plaintiff went to the Dunkin Donuts at 277 Linden St in Wellesley. About 5-10 seconds after parking and turning off his vehicle a maroon colored sedan parked right beside him. The man followed Plaintiff inside as Plaintiff held the door open for him. Plaintiff told the man that he could go ahead of him but he replied "It's fine, I don't know what I want". Plaintiff said he had to place the order on the app so it made sense for him to go first, which he did. The man did not hesitate placing an order for a breakfast sandwich and coffee, implying that he already knew what he wanted.

97. Plaintiff drove to a nearby shopping plaza that included a Roche Brothers grocery store to park and drink his coffee. He noticed that there were a few vehicles spread throughout the parking lot and all of them were running despite the majority of the businesses being closed as it was around 6:00 AM. Plaintiff noticed that the vehicle a few spaces down had a woman in the driver seat with her window down. Plaintiff opened his window, excused himself, and casually asked if she knew what time the grocery store opened. She did not. Plaintiff asked if she was waiting for the store too and she said no. Plaintiff's phone lit up with a dialog that said wireless networks were available. Upon clicking the dialog he saw a wireless network named "FBIwoman". Plaintiff looked up and the woman shut her vehicle off, exited, and then entered the back of a building which appeared to be a Sweet Green. Plaintiff took a screenshot of the wireless networks and went back home.

98. Sometime during the afternoon Plaintiff was with his spouse who agreed to help him move. UCE-3 aka known as R.M. stopped by Plaintiff's unit and made a few comments about moving out. UCE-3 complained that the building was too expensive and of low quality which Plaintiff agreed. UCE-3 asked Plaintiff for the second time this year if his unit was subsidized and he responded no due as it was embarrassing. UCE-3 told Plaintiff that he might move out himself and Plaintiff told him that the property managers allowed Unit 104 and Unit 105 to depart in less than 12 months and maybe they would let him too. Before walking away, UCE-3 made a comment about drinking and said he needed tranquilizers. Plaintiff laughed and carried on with moving.

99. Later in the afternoon Plaintiff was approached by a tenant who he believes was an undercover agent. This individual said "Hey excuse me, is it okay if I ask a question". Plaintiff affirmed and he was asked "I heard you talking to the guy with the glasses earlier" who was UCE-3. The man then asked Plaintiff how he knew that Unit 104 and Unit 105 were able to leave without staying for 12 months. Plaintiff recalled that Unit 104 told him they were leaving (back on September 14, 2025) and did not recall what his response was about Unit 105.

100.    Also on November 1, 2025 Plaintiff and his wife were unsure what to do with an extra bed frame. Plaintiff's spouse listed the item on Facebook and she was almost immediately contacted by a man known as Stephen. Stephen came to Plaintiff's home, entered the bedroom, and together them moved it outside into his minivan. Plaintiff believes that this was a Government agent making the purchase so they could visually search Plaintiff's apartment without a warrant. Just nine days later Plaintiff heard agents admitting they were watching Plaintiff's social media accounts.

101.    On November 3, 2025, the Plaintiff introduced himself to a man who identified himself as JOE ("UCE-2") as he had just moved in to a new complex. UCE-2 had been sitting in a white Toyota truck that was idling in Plaintiff's apartment's parking lot. Plaintiff asserts that this is an undercover agent participating in the investigation and conspiracy to injure plaintiff's mental health. Plaintiff asked UCE-2 which building he lived in to which he pointed at a building across the compound. Plaintiff asked what

his building number was but he could not provide it. UCE-2 told Plaintiff that he should be careful because Plaintiff's neighbor was "weird". UCE-2 further said Plaintiff's neighbor was selling sexual homosexual services and this statement was intended to trigger Plaintiff's anxiety, depression, and make him uncomfortable.

102.    On November 4, 2025, the Plaintiff's birthday, unknown defendant agents of the Government surveilled him so intensely that he could not go for a walk on a hiking path in Wellesley, MA without agents walking or running by him constantly. Plaintiff later walked by a believed surveillance agent and observed what looked like a text conversation on their iPhone. Plaintiff reportedly saw a photo taken of someone that he believes to have been him. Plaintiff became extremely anxious and felt like he was being stalked.

103.    On November 4, 2025 Plaintiff pulled into Whole Foods Market in Wellesley, MA after feeling immense anxiety from the agents that had been walking past him. It was after sunset by this time and Plaintiff went for a walk on a trail connected to the store's parking lot. While on this path he saw a couple of men jogging by him with headgear that had lights affixed. Plaintiff then returned to his vehicle and prayed for nearly an hour.

104.    On November 4, 2025 Plaintiff travelled to a CVS which is about 5 minutes driving distance from his apartment to buy a new car charger. Upon exiting CVS he noticed that the empty parking lot now had 5 vehicles idling and they were positioned in a manner which looked like his car was surrounded but not exactly blocked. Plaintiff felt immense anxiety and despite waiting in the lot for 20 minutes nobody exited their car and the CVS had closed.

105.    On November 6, 2025 Plaintiff purchased a new cell phone after noticing that it again had malware remotely installed on it. Plaintiff believes that the malware was installed through a malicious software update.

106.    On November 8, 2025 Plaintiff communicated with a convicted computer hacker and known FBI Confidential Human Source ("CHS-1") on LinkedIn. During the course of the conversation Plaintiff express that he had known about J.H.'s cooperator status and was not judging him for it to ensure there was comfort in the conversation. CHS-1 and Plaintiff communicated with Plaintiff about a myriad of topics which included Plaintiff asking if the government plants evidence on people which led to CHS-1 answering that the "feds never liked you". Given CHS-1's unique status as a previous cooperator, his knowledge of the feds not having a favorable view of Plaintiff is telling. CHS-1 made several leading conversations which Plaintiff found unusual such as "I just know that I always liked you" and that CHS-1 was "like a big kid". Plaintiff wasn't sure how to respond but told CHS-1 that he did not care whether CHS-1 liked him or not. Finally, CHS-1 specifically asked Plaintiff which medications had he been on. Plaintiff believes CHS-1 was likely acting on behalf of an unknown defendant agent.

107.    An hour or two after sun set on November 8, 2025 Plaintiff was at his residence at in Auburndale, MA sitting down at his kitchen table. Right next to the table is a door that connects to his back porch. This porch is actually a tier which connects to all apartments on the same level as he, similar to how an outdoor motel looks. Plaintiff's back door was open at the time and Plaintiff could hear a man talking on the phone who was taking a call from his back porch, just a few levels down. Plaintiff heard the man state that he is "really good" at what he does and that he "knows how to put things together" because he had been doing it for a long time. This man later turned out to be an undercover agent we'll refer to as ("UCE-1") known by the initials of "B.M.". To Plaintiff's understanding, UCE-1 discussed the organizing of an undercover operation against an individual that he had been working to get for about five years. UCE-1 admitted that he had f***ed up the case and said that it happens sometimes. He stated that he "forgot to put that in there", suggesting that something went unreported. It appeared that the unidentified party had asked a question to UCE-1 in responding that "it hasn't happened yet but it is coming". UCE-1 further went on to explain that that a team would be arriving in the area to handle the clean-up and that everything will be in place when the person UCE-1 was speaking to arrives. UCE-1

stated that there were approximately $6,000 worth of funds remaining in the bank account for expenses and he recommended using the nearby Marriot hotel as needed. UCE-1 indicated that they were going to have to collect all of his issued firearms from him. Plaintiff believes he was talking about retiring. UCE-1 also told the unidentified party that he's provided a new coat every year because they work outside and said that they could take some of them from him if he/she wanted.

108.    On November 9, 2025 Plaintiff's car had broken down in front of 60 Arapahoe Rd located in Auburndale, MA. He requested a tow truck and walked to Star Market in to use the restroom and buy a drink. Between the hours of 1200-1300 Plaintiff was inside of the store heading down an aisle and was met by an unknown agent conducting surveillance. The agent was a slightly taller white male wearing glasses and white air buds. The agent allegedly told Plaintiff "We're coming to get you, we're wherever you are". Plaintiff shouted "why?" but the individual continued walking. Plaintiff purchased a PowerAde at the self-checkout then walked back to his vehicle. When Plaintiff returned to his car he sat in the passenger seat watching the road in front of him until help arrived. Plaintiff thought to himself that it seemed like an unusually large amount of solo pedestrians started walking by his car as he sat in his passenger seat. All of them also had white ear buds in too just like the man in the store which was peculiar.  While it might be normal for pedestrians to be outside, Plaintiff knew that individuals in the area were financially well off, most have cars, and it was cold and wet.

109.    On November 9, 2025 Plaintiff interacted with multiple neighbors in his building to ask if anyone knew if someone had entered his new apartment while he was not home (this issue was resolved and nobody had entered). Plaintiff eventually knocked on the door of UCE-1 downstairs from him. UCE-1 opened the door surprised and Plaintiff introduced himself. A moment later the male tenant living in Unit 4 exited his room to join the conversation. Plaintiff mentioned that whoever accessed his unit did not take anything and he thinks it happened due to markings on the wall that he had not noticed before. UCE-1 indicated that he knows professionals that execute covert break-ins and they would never do something like that. Plaintiff out of curiosity asked who and he mentioned law enforcement. UCE-1 later joked that the property manager should charge $500 less per month if the building is not secure and persons can enter using old keys for example. UCE-1 asked Plaintiff if he had any valuables in his unit to which he responded no and that the most valuable asset might be his work laptop that was untouched. UCE-1 said that he had many firearms in his apartment. Plaintiff asked him if he really had guns and UCE-1 responded excitingly "Yes, do you like them?" Plaintiff said "No, I'm not allowed to have them because of a past felony". UCE-1 told Plaintiff that he has a relative down in Florida who was a federal prosecutor that could help him out. After a short pause he told Plaintiff "I can make your federal problems go away". Plaintiff chuckled and said no thanks. Plaintiff then asked UCE-1 where he was employed and he told him that he worked across the street which is the MBTA's Riverside Train Station which is on the green line track. UCE-1 told Plaintiff he'd introduce him to the neighbors living in their complex this summer. Plaintiff read this to mean that he may be apprehended around that time and felt UCE-1 tried to entrap him in offering to fix "federal problems". Plaintiff did not specifically indicate he had federal records.

110.    On November 10, 2025 Plaintiff began drafting this lawsuit at the Boston Public Library at 700 Boylston St in Boston, MA. Plaintiff noticed two men nearby had been staring at him and were probably doing surveillance. Both male individuals were positioned near the windows closest to Computer#13 in the lab area. Agent-1 was a white male and both were within an earshot's distance. Plaintiff clearly heard Agent-1 tell Agent-2 "I hope he doesn't start yelling when I search him, ha". This comment was made deliberately to trigger Plaintiff's anxiety and induce panic. Agent-1 and Agent-2 discussed the fact that Plaintiff had not posted anything to Instagram yet which suggested that they were monitoring his social media posts and knew he was drafting this lawsuit. Plaintiff continued to focus on the lawsuit but was constantly distracted due to their conversation. For example Agent-1 told Agent-2 "Well, we've got his Bank of America records" which is exactly where Plaintiff banks. During these talks

Plaintiff recalled having to the restroom but he chose to hold it until AGENT-1 and AGENT-2 walked away because of the fear of being mistreated.

111.    Plaintiff eventually had to logoff as the library was approaching closing time and headed to the restroom for a second time. Plaintiff had noticed Agent-1 and saw that he was now with a female agent, referred to as Agent-3, once he left the restroom. He used the stairwell that's located just beyond a security desk that faces the Boylston Street entrance and went to the third floor. Agents furtively followed him and remained about roughly 20 feet behind him. Plaintiff then turned several corners while walking at a normal pace and agents continued to follow, keeping him in their sight. Plaintiff looked back several times at them which caused them to immediately look in another direction or stop walking for a few seconds. Plaintiff stopped paying attention to them and after a few minutes he turned a corner and somehow ended up behind both of them. As there was only one direction he could travel he continued walking behind the agents until he was able to get away from them. Plaintiff eventually sped up his walking and went to the security desk that faces the Dartmouth Street exit. Plaintiff told security that people were stalking him and then asked to use the desk phone because his phone might die. Plaintiff made several phone calls in an effort to get help but nobody had answered. The fact that Agent-1 said he was going to search Plaintiff but did not do so demonstrates that this was discriminatory harassment.

112.    On November 11, 2025 Plaintiff attended outpatient services at Newton-Wellesley Hospital for mental health treatment. Due to the Plaintiff's vehicle still being repaired he had to travel on foot. Plaintiff observed many people jogging by him which was unusual given the cold weather and fact that he was very close to multiple highway onramps. While Plaintiff was between 2344 and 2150 Washington St two young looking women jogged past him and one turned around saying "wow, you're a boss". Plaintiff believes these were agents and he became aggravated because he's still married despite being physically separated. Plaintiff was walking on the same side of the street as the Newton-Wellesley Hospital.

113.    On November 11, 2025 at 4:27 PM Plaintiff sent an e-mail to his previous property owner, who had been supporting agents in their undercover operation, why there was no decrease in the cost of his water bills despite his wife and two kids being moved out two months ago. Plaintiff believes he was overbilled for the last two months of residence at 680 Worcester St because Defendant agents had ruined his relationship with the property management company. His e-mail went unanswered.

114.    On November 12, 2025 Plaintiff commuted to the Kelly Infiniti dealership in Danvers, MA to pick up his repaired vehicle. Plaintiff took the Woodland Station green line train to Park Street. He then went to look for a restroom that was near the redline trains but was unable to find one. He then returned to the green line and used it to travel to North Station in Boston. While at North Station Plaintiff saw a man wearing train station attire . Upon arriving at the Commuter Rail Station in Beverly, MA the Plaintiff had requested a Lyft. His cell phone indicated that Agent-4 aka "JOSE" had accepted his request and would arrive in a 2014 Subaru Outback. Plaintiff observed Agent-4's vehicle prior to him being picked up and noticed a woman exit his vehicle using the rear passenger side door. Agent-4's vehicle pulled up against the sidewalk around the corner which influenced the Plaintiff to use the rear passenger side door, where a woman had been sitting. While in-transit, Plaintiff took a photo of a Toyota sedan that passed his Lyft who he believes is likely a female agent conducting surveillance. This individual is referred to as Agent-5. At some point during the ride Plaintiff noticed some items in the door's slot to his right and discovered that there were numerous receipts, papers, and packaging pertaining to American Express Prepaid Gift Cards. The receipts indicated that there were two prepaid cards and that they were each loaded with $500.00 at the Cumberland Farms in South Hadley, MA. The receipt noted that the load commenced on 10/28/2025. Plaintiff confronted the driver who seemingly could not provide any detail as to who had just exited his vehicle and mentioned that he had a prior criminal conviction related to fraudulent gift cards as such. Plaintiff repeatedly asked the driver if he knew anything as to why there would coincidentally be gift cards in a car he had gotten into. Agent-4 responded negatively. Plaintiff asked Agent-4 how long he had been driving and he said 2 months, however the Lyft app only mentioned that he had been driving for

one. Plaintiff believes that his Lyft travel was observed by surveillance agents and one specific female, believed to be an agent, was seen driving a Toyota sedan out of the window. Upon exiting the vehicle, Plaintiff engaged Officer Robert Sullivan (Badge# 989) who also was coincidentally was at the Plaintiff's drop off point, Kelly Infiniti in Danvers, and the two discussed the matter that had transpired.

115.    On November 13, 2025 Plaintiff's car had a gift in the backseat that was from his daughter and intended for Plaintiff's father. This box was sealed prior to the vehicle being dropped off at the dealership back on November 9, 2025. At some point the Plaintiff  inspected the box and found the tape has been pried off and it was indeed opened. Plaintiff did not escalate the matter and merely taped it back shut.

116.    On November 18, 2025 Plaintiff left a friend's house where he had been working on this civil suit to avoid interruption and harassment in public. Upon exiting the residence plaintiff noticed a blue Hyundai sedan with a veteran plate drive down the street prior to Plaintiff getting into his car and the driver was looking at him. The blue Hyundai parked a block away, in front of another vehicle. This block is an open field so it was visible to Plaintiff. In his return home, he had to travel by the Hyundai and saw that both vehicles consisted of men in the driver seat, one wearing a baseball cap and hooded sweatshirt. Both males stared at Plaintiff as he drove by.

117.    On November 19, 2025 Plaintiff filed the initial version of this complaint with the Court. Approximately 30-45 minutes later the Plaintiff observed two vehicles aggressively moving through congested traffic while he travelled south on I-93. One of those vehicles was a silver colored sedan and the Plaintiff recognized the driver who was a female with gray hair. The Plaintiff had seen her at some point in the recent past and believes she must be one of the case agents.

118.    On November 21, 2025 Plaintiff received a dosage change related to his medication due to feelings of paranoia. Plaintiff states that paranoia is being caused by the Government's surveillance actions.

119.    On November 24, 2025 Plaintiff filed his first amended complaint with the Court, adding in additional details including the allegation concerning AI-1 being arrested.

120.    On November 25, 2025 Plaintiff was at work and overheard AMAZON INVESTIGATOR 1 ("AI-1") speaking on a video call in a loud manner. Plaintiff heard AI-1 speaking in code that he was leading an investigation which apparently was going to be sunset. According to AI-1 he stated that the case was being closed out because "they were really interested in the it" and "there wasn't anything there really". Based on his terminology it was obvious that they were talking about a subject who's health was jeopardized and Plaintiff having just returned from an extremely stressful leave of absence would somewhat fit into his narrative. AI-1 continued on to state that he was the one leading the charge internally and working directly with law enforcement. AI-1 went on to make disparaging comments about assumed FBI agents stating "if they wanted more engagement then they should have made the goal about it". AI-1 continued on saying that they put him in a really bad spot and that there will be a big meeting early next week that will contain some folks from Human Resources and more. Plaintiff had just returned to work and felt very uneasy about the situation but ignored it and continued to work.

121.    On November 27, 2025 AMAZON INVESTIGATOR 1 ("AI-1") spoke to his FBI partners about the lawsuit Plaintiff filed a few days earlier. AI-1 specifically told them that the allegation concerning UCE-3 being arrested was going to impact the case, guaranteed. AI-1 continued on to say that he thinks that the timeframe noted in the lawsuit coincided with the timeline of events where investigators learned a key detail pertaining to a subject and it was no coincidence.

122.    On November 28, 2025 an FBI Supervisor informed the team that all of their applications were being retracted and that the case had been moved back a step. According to a sensitive law enforcement document, page 19 summarily stated that internal investigators did not care if this was going to cause delays or if the evidence was already verified. The case agents are scheduled to attend an interview on January 5, 2025.

123.    On December 2, 2025 Plaintiff was at work and overheard AI-1 discussing sensitive details about the FBI's investigation into Plaintiff. The individual on the other end of the call was another Amazon investigator ("AI-2") known by initials A.L. which may be a cover name and seems to be a superior of AI-1. AI-1 said that it's really sad that FBI leaders kicked the case back and that everything was verified in his opinion. He explained that the search warrants were rock solid as they went through them with a DOJ attorney prior to having them signed off. He expressed frustration because he had travelled to Miami to acquire a warrant and was denied due to reliability concerns. Plaintiff believes this warrant could have been related to the malware being placed on his device. Plaintiff heard AI-1 say "they can do anything they want to him" and that they have him on distribution. This comment made Plaintiff extremely uncomfortable because he was not a drug dealer. AI-1 also made a comment suggesting that it was easier for him to do his work when Plaintiff was not on site (indicating that he would rather have him on leave). AI-1 went on further to tell AI-2 that non-Government law enforcement officers were the ones to blame for the actions taken against Plaintiff and that a situation was going to be "re-created". Plaintiff read into this to mean that investigative documentation might be altered to avoid having any references to items that may jeopardize the case before the upcoming January 5 interview.

124.    On December 4, 2025 Plaintiff was at work and started feeling anxious because he sensed that people were beginning to follow him inside of the office. For instance, Plaintiff travelled to the cafeteria on the 3rd floor and saw an individual that he knows is not an Amazon employee and had seen back on November 10, 2025 – the day when gift cards were planted in Plaintiff's rideshare. During this time Plaintiff did not witness anyone following him into the bathroom which had happened previously, including inside of grocery stores.

125.    While Plaintiff was working from his desk he saw Philippe ("UCE-4") who Plaintiff also saw at his wife's naturalization ceremony back in July. UCE-4 was occupying a workstation diagonally from Plaintiff and he was speaking loudly on a voice call, likely due to not being aware of his volume because of the wearing of headphones. Plaintiff also heard the voice of AI-1 who was seated two rows behind him and could tell based on the timing of their voices that they were speaking with each other. Plaintiff heard UCE-4 say to AI-1 "I have a great idea, how do you feel about temporary protection status right now?". AI-1 responded "I think that's a great idea, I like it. I'm aligned". Philippe then said "ok I'll set the operation up, how does between 3:00 and 4:00PM sound?" AI-1 replied that it was good. Plaintiff had to pay for his parking meter at that time so he exited and headed out to his vehicle.

126.    Once Plaintiff made it to his vehicle and paid for the meter he had noticed a group of group of six men and two females wearing yellow Verizon vests. They were talking about assembling a team and said that they wanted to wrap it up quick. A man was drawing an area with his finger saying that a few of you would take the front and the rest would take the rear area. Plaintiff was waiting to cross the street and he heard another person say F1 that's the location in front of F1 right? F1 is the desk where AMAZON INVESTIGATOR-1 sits and who had mentioned things related to Plaintiff. Plaintiff believes this was done deliberately to strike fear into him that something was going to happen to him between the hours of 3:00-4:00PM.

127.    Plaintiff crossed the street and before getting to the office encountered a man with a dog that had a muzzle on, talking with a woman. Plaintiff heard the man tell the woman to make sure she grabs his phone while it's on. She asked how they are going to be able to do that and the man said "We can stage two dogs barking maybe and startle him since another guy has a dog up there". He then said "That's when we go in." They looked back, saw Plaintiff, and immediately walked away. Plaintiff was extremely nervous and quickly went back to his desk in the office.

128.    Upon entering the building Plaintiff got into an elevator with two men who had been following him closely once he entered the building. They were talking loudly and moving closer and closer to Plaintiff which made him move himself into the corner the elevator. Plaintiff eventually got off on his floor and rushed out to grab his belongings. Plaintiff closed his laptop and an individual known as

J.G., an Amazon Program Manager whom Plaintiff now believes is an undercover agent, asked where is he going. Plaintiff told J.G. that he wanted to enjoy some freedom downstairs and he'll see him later.

129.     Plaintiff proceeded to the third floor cafeteria in the Amazon building and sat down against a wall for his own safety. Plaintiff opened his laptop and took a video call. While Plaintiff was seated, the empty cafeteria soon filled up with individuals that had Amazon loaner badges, indicating that they were let in by security without an official work Id. Plaintiff then noticed some familiar faces that he knows he had seen  somewhere else and not inside of the building. As Plaintiff reached the end of his call an Asian man walked in front of his table and computer and pointed directly at him. An Asian woman that looked extremely young then sat directly to the right of Plaintiff.

130.     Plaintiff felt uncomfortable and went on to tell his manager that he wanted to step away from work due to an incoming panic attack. She approved and Plaintiff immediately left the building. Plaintiff got into his car and started screaming profanity once he closed the door in rage as the Plaintiff felt that the Government was doing this to destroy his mentality. Plaintiff later cried until he let out all of his emotions. Plaintiff eventually made it home and after words went to the library with his Amazon laptop to finish what work he left behind.

131.     That evening Plaintiff thought about everything that he had been hearing over the last few months and thought that it was odd that AI-1 mentioned distribution. Plaintiff thought about how the man directed the Asian woman to sit next to Plaintiff who looked extremely young and that there was a pair of girls that jogged by him a month earlier who made a comment. Plaintiff had also seen explicit items in his Google account at some point that he did not put there and over the last few months observed texts and calls from people he never knew. In addition, Plaintiff's wireless internet was being accessed for multiple weeks and he had no way of knowing if that happened at other places he had lived at either. Plaintiff also knows that his social media accounts were taken over in recent months likely because the Government had access to his household's wireless network and passwords from the RemoteCOM monitoring software while on probation.

132.     Plaintiff filed two ethics complaints about the man who was sitting in F1 which was the desk occupied by AMAZON INVESTIGATOR 1 indicating that he breached confidentiality and that Plaintiff was discriminated against because of the mental health anguish he experienced from hearing this information.

133.     On December 5, 2025 Plaintiff arrived at work and his manager known as L.G. sent him a message at 11:33 AM asking if he was okay. Plaintiff said "I didn't feel that out of place today… so yeah nobody seems to be screwing around…"

134.     Minutes later Plaintiff heard a man known as Philippe talking over a voice call about details that sounded like it was pertaining to an investigation. Plaintiff knew Philippe as a Program Manager with Amazon but now knows that he is an undercover FBI special agent. Philippe was speaking to an individual he referred to as Armand and he was talking about trying to link IP addresses from Australia to China. Philippe referred to an excel spreadsheet and said that he should look at the IP's in Column D. Philippe appeared to be explaining to someone who sounded like a superior as he was being asked to explain why he held a specific theory. Another individual that Plaintiff knew as an Amazon Program Manager, J.G., whom Plaintiff worked with on projects with going back the last year was also having a conversation that resembled an investigative conversation. J.G. told the person on the other end that they might want to avoid adding in a specific conversation into a document because it would be difficult to link back to the end user. J.G. said that they will have to do a lot more paperwork on it and it will be very complicated.

135.     Around 12:45 PM Plaintiff was approached by two men that identified themselves as security. One man known as Scott L. asked if Plaintiff could speak to them about a situation in a private setting. Plaintiff asked why and was told that BAC (Benefits Assistance Center) received a call asking them to conduct a wellness check. Plaintiff agreed and followed them to one of the meeting rooms off to the side.

The room is also known as a huddle room and it consists of a circular table with a flat edge against the wall, a television, a microphone, outlets, and a light/dimmer switch. The table could sit about four people. Plaintiff entered and sat at the left most seats, TJ sat blocking the doorway, and Scott sat across the table. Plaintiff felt like this was a law enforcement interrogation and asked both men to identify themselves. Each showed a yellow contractor badge which indicated that they're not Amazon full time employees.

136.    The other staff member identified himself as TJ Hannon. Plaintiff asked if he could record the conversation and both of them told Plaintiff no. Plaintiff stated that he has a pending lawsuit regarding harassment in federal court and he wanted documentation. They told Plaintiff that he's not allowed to record because of Massachusetts' one party consent rule and Plaintiff replied well at the federal level it's two party consent rules and my case is a federal question. Plaintiff was again told no.

137.    Plaintiff again asked for clarity as to why this happened and they repeated that the Benefits Assistance Centers had called for a wellness check to make sure I was ok. Plaintiff stated that it must be related to the ethics complaint, right? They said to tell them about that complaint, what happened? Plaintiff responded that it's against the NDA to tell non-Amazonians about internal reports so he respectfully said he would not tell contractors that. They said they were ok and TJ then conducted a Google search to find the lawsuit. Plaintiff told him to lookup Lacroix v. Leatherman TJ said wow, I can't believe it's on the internet, it gets there so fast.

138.    Plaintiff was asked if he wanted to go to the hospital and the Plaintiff said he didn't think it was necessary because he's being treated by doctors and he trusts his team. Plaintiff was asked what he was diagnosed with and Plaintiff said that's a HIPAA question but provided anxiety, depression, and schizophrenia. They asked Plaintiff if he took his medication and he said yes he did and was asked if he'd see EMS. Plaintiff said he would be willing to see EMS to ensure there was documentation since he had been facing harassment and discrimination at the workplace.

139.    Plaintiff asked if he could go back to work and was told not until he saw EMS. Plaintiff was frustrated because he was the one that agreed to talk with EMS. Plaintiff then asked if he could leave to get water and was told he could not leave, again, until he saw EMS. Scott offered to get him water though and he said he'll just sit tight then to speed things up.

140.    As everyone still waited for EMS Plaintiff had asked what initiated this and they again mentioned that the Benefits Assistance Center asked them to do so. Plaintiff asked them how long they have been doing security with Amazon and TJ volunteered that he's not in the Boston office too often and that he had only been there the last three days. Plaintiff told TJ "Yeah I know, I saw you yesterday". TJ said wow with a surprised tone. Within five minutes two men wearing EMS uniforms arrived despite being on the 5th floor and having to get badged into the building. Plaintiff asked how they were able to get up there so fast and EMS said oh we are always around the corner. TJ told Jacob that they were told to speak to Plaintiff because of an ethics complaint that Plaintiff had filed. Both EMS agents were white males – one was named being Jacob with dark hair and another's name was unknown but was blonde.

141.    Plaintiff asked who called EMS and TJ said they had. EMS asked Plaintiff if he knew who the President was and what day of the week it was – both questions were answered affirmatively. Plaintiff asked who was paying for this visit and TJ told Plaintiff that he would not have to. Scott asked Plaintiff about maybe going home to work for the day and Plaintiff said he's not allowed to do that and that any accommodations like that must be approved through HR channels. Plaintiff then asked EMS what the caller said to their dispatcher. The blonde EMS officer said that they were told about a hallucinating man. Plaintiff immediately got upset and told Scott and TJ "what the heck is this?" The blonde haired EMS agent told Plaintiff it's just telephone tag, it must have gotten messed up and TJ quickly agreed.  Plaintiff believes AI-1 knew about the ethics complaint that was filed the night before and he personally told security that Plaintiff was hallucinating.

142.    Plaintiff said he needed to get back to work because he just came off of leave and his performance might be affected. Plaintiff then demanded to exit the room by asking "am I free to leave?"

due to feeling falsely imprisoned. TJ told him that he was free to go and said something about putting a phone in a faraday bag which was odd (Plaintiff researched this on Google and doesn't have a device made to block cell phone signals).

143.    Plaintiff returned to his desk and took a work related video call with some Senior-leveled stakeholders. Plaintiff immediate apologized to the group stating that something held him up. Within a few minutes of the video call the EMS Member Jacob entered Plaintiff's personal space and there was a black uniform with a badge clearly showing in the Plaintiff's webcam. Plaintiff felt extremely embarrassed and told Jacob to "please stop I'm on a call". Jacob started speaking loudly and Plaintiff handed him his ID so he could type his information in. Plaintiff then signed on the tablet before being able to return to the call.

144.    At the conclusion of the call Scott L. came over to Plaintiff and said that he thought it was a good idea if he went home and Plaintiff challenged the directive saying he was better staying put. Scott L. said that Plaintiff asked to go home and Plaintiff clarified saying "No, what I said was that any changes like that have to go through HR". Scott L. then said that he received permission from my HR contact about working from home the rest of the day. Plaintiff said no because his doctor's recommended that he work and stated that it's therapeutic. Plaintiff was told he should go home again and he responded that it's an inconvenience to the whole way home which is an hour and I do not have access to a comfortable cafeteria, coffee, and such. Plaintiff showed Scott L. the messages between himself and his manager known as the initials L.G. The conversation between them consisted of Plaintiff's manager checking in on him and her saying that she was happy that everything was ok. Plaintiff said his manager didn't seem to have a problem and that things only become problematic when people harass him. Plaintiff was being pressured to go home and said he's calling his attorney. At this point Scott L. and TJ Hannon stepped away and TJ immediately got on the phone.

145.    Plaintiff then messaged his Human Resources POC known as A.G. stating "... I was told just now by security in the building that it's ok to work from home but I didn't necessarily request this. I merely said to them that all requests … had to be cleared by you". Plaintiff supplemented that his boss checked on his wellbeing and Plaintiff suggested he continue working so he doesn't miss calls and just use one of the single rooms off to the side. A.G. told Plaintiff that he had a lot going on and to head home to work for the remainder of the day and to let her know if he needed any support. She also told Plaintiff to go home and be free from any distractions in the workplace.

146.    Plaintiff said "Sorry for the back and forth…. If I am saying I am ok and refuse … am I going to be written up?" and "I filed an ethics complaint yesterday and it's kind of like retaliation". A.G. replied that they just want to make sure they have the support I need. Plaintiff told her he refuses to leave and she said that Plaintiff reached out saying it was ok to work from home. Plaintiff responded "Oh nooo sorry I did NOT say that" and "they changed my words."

147.    Plaintiff was then contacted electronically by N.T. who is one step below Plaintiff's organization's Director. He told Plaintiff that he should go home and that they could talk about it on Monday. N.T. told Plaintiff not to worry about his performance because he knows how much he's contributed. A.G. followed back up with Plaintiff stating "Your performance is not in question right now and is not affected. But yes, I am telling you to please work from home the remainder of the day". Plaintiff told her "ok I am staying put" and "ok I think I am good. The guy just texted someone". A.G. asked what Plaintiff meant and Plaintiff replied "there are two men here that are communicating via cell phone with a specific person. And I heard him say that he engaged someone. I then asked if I am being detained/free to leave and they said no. I was told that I can resume work".

148.    Plaintiff resumed working until being told by Scott that Boston Police was on site and he had to go. Plaintiff filed another ethics complaint related to the unfair treatment towards him after turning off his laptop. Plaintiff was escorted to the restroom so he could use it but told to "make it quick". After two minutes Scott entered the restroom and told him "come on, let's go". Plaintiff said he wanted to wash his

hands but chose to skip it in order to comply faster. Plaintiff was escorted out of the restroom and into the elevators. Before the door had closed Plaintiff noticed that AMAZON INVESTIGATOR-1 was in the hallway with a shocked look on his face, looking directly at him.

149.    After Plaintiff was walked out through the turnstiles he told Scott that he hoped he wouldn't take the whole thing personally and that he had been harassed and felt it was unfair that he's being penalized despite doing the right time. Scott told him not to worry about it. Within an hour of being walked out Plaintiff received an alert on his phone that he was signed out of all work applications. He placed a phone call to Amazon's Employee Resource Center ("ERC") hotline who told him he was suspended indefinitely without reason.

150.    Plaintiff immediately went to his parents' house as he felt like he was going to "lose his mind". Plaintiff's Human Resources POC sent him an e-mail later telling him that he was to undergo a fitness for duty examination which is a type of leave of absence and that he'd be placed on paid suspension which the ERC had told him earlier. There was no information as to why anyone would be questioning his mental state.

151.    On December 6, 2025 Plaintiff went to a CVS to pick up emergency medication as his depression tablets were back home which was more than an hour away. While at the CVS Plaintiff say two individuals that looked like members of law enforcement, posing as a couple. Despite Plaintiff being in the CVS for 15 or so minutes they would not let Plaintiff out of their sight. They patrolled multiple aisles without having anything in their hand and made eye contact with Plaintiff multiple times.

152.    On December 7, 2025 Plaintiff went with two of his family members to a local crisis center for an evaluation and was denied entry because he did not have his enough of his medication on him. He later travelled back home to retrieved his medicine, clothing, and cosmetics, and then spent the night at his parents' house.

153.    On December 8, 2025 the Plaintiff reported to Child and Family Services' Crisis Unit in the afternoon and admitted around 3:30PM. Plaintiff was seen by a mental health clinician within minutes of entering.

154.    On December 11, 2025 Plaintiff was discharged with newly added medications intended to help control the anxiety stemming from the constant FBI harassment and actions of the FBI.

155.    On December 17, 2025 Plaintiff was advised by Amazon HR that there is a confidential investigation taking place and he is to remain on suspension until further notice.

156.    Plaintiff states that he has been stripped of nearly every constitutional right as he is unable to live and breathe without constant surveillance. Plaintiff has witnessed drones following him on multiple dates such as November 7, November 14, and December 6, and December 23 which have also been witnessed by his Pastor known as M.M. and immediate family members. Plaintiff contents that he's lost his family, financial wellbeing, and nearly all sanity had it not been for the medication he's been issued. Based on the totality of the circumstances it is clear that the Government has Plaintiff under multiple investigations and they are using these as a pretense to sabotage his mental health.

157.    Plaintiff believes based on the totality of circumstances that the Government is working to frame him for access device fraud based on planted gift cards, distribution of child pornography due to the July 25 meeting and FBI purposefully sending young women to sit with and jog by Plaintiff, and exceeding access without authorization based on his opening of a malicious file at work and confidential looking documents shared to his Google Drive. While this is not the right Court to determine guilty or innocence Plaintiff charges that the Government's actions based on the preceding events amount to a conspiracy to defraud the Constitution of the United States and his rights have therefore been violated.

## COUNT 1 - FALSE IMPRISONMENT, ARREST, and ILLEGAL DETENTION | FOURTH AMENDMENT

Plaintiff re-alleges the allegations in paragraphs from 1 - 157.

Plaintiff does not feel that he is free to travel as he pleases as there is no sense of privacy regardless of where he is while out in the world. Plaintiff is under tight physical surveillance everywhere which includes while he's in his home, in a car, in church, or when he attends medical appointments.

Plaintiff was confined to a small hiking area on November 4, 2025, his birthday, as multiple agents continued to job past him continuously.

Plaintiff was confined to a computer at the Copley Library on November 10, 2025 after AGENT-1 and AGENT-2 threatened to search him. Despite having to use the restroom Plaintiff held it until they left and he had felt it was safe to go.

Plaintiff charges that all Defendants participated in false imprisonment by supporting an undercover mission designed to harass and inflict psychological pain upon him.

## COUNT 2 – ILLEGAL SEARCH AND SEIZURE due to HACKING of WIRELESS NETWORK , STALKING | FOURTH AMENDMENT

1. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2. Defendant agents supporting an undercover mission moved in to multiple units at 680 Worcester Street in Wellesley, MA where Plaintiff and family resided. The move-ins began in the spring and completed during summer.

3. At the time of Plaintiff's residency there was only one single family home beside the property which was not within range of his wireless network's signal.

4. On August 31, 2025 Plaintiff confirmed that a computer in their household had a malicious software running.

5. On September 20, 2025 Plaintiff found evidence demonstrating that two desktop computers had logged in to his household's wireless network without authorization between August 4, 2025 and August 15, 2025.

6. Plaintiff and family did not own a desktop computer at this time and only they were authorized to use their wireless network.

7. Plaintiff's wireless router only provided him with the date that a computer was last seen on his network indicating that access could have predated August 4, 2025.

8. On September 22, 2025 Plaintiff asked his property manager for the access logs for his apartment to see if anyone had entered without permission. Plaintiff was told over the phone that they would provide them but shortly thereafter reversed course saying they'd only provide it to law enforcement.

9. On November 8, 2025 Plaintiff overheard an undercover agent talking about an investigation which confirmed the existence of Defendants' plan to hack, frame, and torture him.

10. Plaintiff asserts that this investigation was not carried out in good faith as he received multiple notifications that his accounts were being accessed by other devices, malware had been deployed, and his network was hacked.

11. Defendants violated his Fourth Amendment rights by accessing the network in the District of Massachusetts the two dates mentioned, August 4, 2025 and August 15, 2025.

12. Plaintiff points to the fact that Defendants also rummaged through his social media accounts based on the fact that he was receiving a lot of unauthorized login attempts around the same time malware had been interfering with his freedom to use the Internet.

## COUNT 3 – ILLEGAL SEARCH AND SEIZURE VIA USE OF CELL SITE SIMULATOR & DISCRIMINATION | FOURTH, FIFTH, AND EIGHTH AMENDMENT | AMERICAN WITH DISABILITIES ACT

13. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

14. Plaintiff experienced difficulty in placing an outbound call for medical services on September 24, 2025 causing him anxiety and emotional distress.

15. Plaintiff was able to place a call and speak with a female secretary known as Jasmine but after a short while he was no longer able to hear what she had been saying as the line went completely silent. This led to issues understanding what the provider was asking Plaintiff.

16. Plaintiff moved to another room and called back using the Google Voice app which relies on a data session rather than routing the call through the cellular network.

17. Plaintiff received device alerts indicating that his phone connected to a rogue cell tower known as an IMSI cell site simulator. He received these alerts on October 7, 2025 and October 10, 2025 which was a new Android feature following a device upgrade.

18. Plaintiff believes unknown Defendant agents were responsible as the FBI and Deputized Task Force Officers belonging to the Massachusetts State Police frequently use this technology.

## COUNT 4 – RETALIATORY PROSECUTION | FIFTH, SIXTH, and FOURTEENTH AMENDMENT

19. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

20. Plaintiff sent an e-mail to the U.S. Attorney's Office on July 5, 2025 asking if they would remove a prejudicial article that had been on the web due to it costing him several job offers. Plaintiff's e-mail said that DOJ policy normally did not permit the publishing of articles like that especially where Plaintiff was not formally charged with anything.

21. Within 30 days the Plaintiff's wireless network was hacked and after 30 more days nearly every device he had touched had remote controlling malware, including his work laptop. Additionally, evidence was planted in multiple locations to include – sexually explicit messages dropped into his Google Groups Account, an email resembling drug activity "bath bombs" was sent to his Google Mail Account, and gift cards were found inside of a Lyft which were the same type of gift card that he previously defrauded in a prior case.

22. The escalation was also sent to the Office of Inspector General and on August 7, 2025 sent to the Executive Office of the U.S. Attorney.

23. Plaintiff charges that Defendants retaliated against him and ramped up an investigation based on vindictive reasons.

## COUNT 5 – ILLEGAL SEARCH AND SEIZURE, DISCRIMINATION, and HARASSMENT due to HACKING of CELLULAR TELEPHONE | FOURTH AMENDMENT | Title VII Civil Rights Act

24. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

25. Between August 30, 2025 and September 5, 2025 a cellular telephone used by Plaintiff was being controlled by malicious software installed by unknown Defendant agents in collaboration with an external partner acting at the behest of unknown Defendant agents.

26. The malware interfered with the Plaintiff's usage of ordinary web browsing and forced him to login using less secure means.

27. The malware activated the Plaintiff's microphone and captured audio without authorization.

28. The malware altered the social media feed of his LinkedIn account to display negative stories such as employees talking negatively about Amazon an individual being sentenced to prison for SIM swapping.

29. Plaintiff discovered that his device settings had been altered to permit the sharing of keystrokes between the Personal and Work profile on his phone. This is a serious breach of security as it would give his employer access to conversations, web searches, and more.

30. Personal data from the cellular phone was indeed transmitted to an external server without authorization.

31. Plaintiff experienced severe emotional distress and anxiety as a result of the intrusion.

## COUNT 6 – STALKING & HARASSMENT, FALSE IMPRISONMENT | Title VII Civil Rights Act, American with Disabilities Act, Fourth Amendment | EIGHTH AMENDMENT

32. Plaintiff re-alleges the allegations in paragraphs 1 - 157

33. On November 9, 2025 the Plaintiff entered a Star Market in Auburndale, Massachusetts to buy a drink.

34. Plaintiff travelled down an aisle and once he arrived in front of the PowerAde section he made eye contact with a tall white male wearing glasses and white air buds. The man referred to as UNKNOWN AGENT #2 told Plaintiff "We're coming to get you, we're wherever you are".

35. Plaintiff responded "why?" and UNKNOWN AGENT #2 walked away.

36. Plaintiff was harassed for no reason other than to exploit his mental illness and instill feelings of anxiety and paranoia.

37. Plaintiff effectively felt seized in the moment as he was told by law enforcement that he is not going anywhere without the Government's presence.

## COUNT 7 – HARASSMENT, ILLEGAL DETENTION | Title VII Civil Right Act, American with Disabilities Act, Fourth Amendment, Fourteenth Amendment

38. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

39. Plaintiff announced on his social media account that he would be preparing a lawsuit against the Government. On November 10, 2025 he began working on it using the computer lab at the Boston Public Library located at 700 Boylston St in Boston, MA.

40. Plaintiff asserts that two male agents positioned themselves near the window closest to Computer #13 where Plaintiff was seated. Plaintiff heard AGENT-1 tell AGENT-2 "I hope he doesn't start yelling when I search him, ha".

41. AGENT-1 also told AGENT-2 "I don't see anything posted on his Instagram yet", suggesting that they were indeed monitoring his social media profiles.

42. Plaintiff experienced emotional distress, anxiety, depression, and paranoia after hearing this comment. Plaintiff was never searched, demonstrating pure harassment.

43. Plaintiff also avoided going to the restroom for as long as possible while using the computer because as he feared an illegal detention for preparing a civil case.

**COUNT 8 – OBSTRUCTION OF JUSTICE / PLANTING EVIDENCE | Title VII Civil Right Act, American with Disabilities Act, Fourth, Fifth, Sixth, and Fourteenth Amendment**

44. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

45. Plaintiff was aggressively monitored the moment he left his home on November 12, 2025 to retrieve his repaired vehicle from the dealer. He was under physical surveillance as he utilized multiple trains and finally a Lyft rideshare.

46. A Lyft driver known as AGENT-4 picked Plaintiff up in a 2014 Subaru Outback bearing MA tag 4TEH62. While in route to his final stop Plaintiff observed a Toyota driving at the same rate of speed as his rideshare and realized that the driver, known as AGENT-5, was monitoring him because he had seen her in the past. She was operating a Toyota with MA tag 5PHD44.

47. Plaintiff noticed something tucked into the slot of the door to his right. He reached in and pulled out two prepaid American Express Gift Cards, indeed with receipts. The cards were each loaded with $500.00 and had surcharges due to fees.

48. Upon Plaintiff's arrival at the Infiniti dealership there was a Danvers Police Officer parked directly in front of where AGENT-4 dropped him off. Plaintiff approached the officer and informed him about the gift cards in the vehicle in an effort to distance himself from planted evidence.

49. The ordeal was captured on video and neither party objected to the Plaintiff recording.

50. Plaintiff experienced extreme stress from this situation and cannot utilize any ride share without fear of planted evidence within. Plaintiff believes Defendants sought to manufacture a false case against him involving gift cards.

**COUNT 9 – ILLEGAL SEARCH AND SEIZURE - USING CI to CIRCUMVENT HIPAA LEGAL PROCESS | Fourth and Fourteenth Amendment**

51. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

52. Plaintiff asserts that an CHS-1 known as J.H. engaged him on LinkedIn on November 8, 2025.

53. Plaintiff learned that he was the subject of an undercover mission hours later.

54. Plaintiff believes that CHS-1 was acting at the direction of unknown agent(s) seeking information about Plaintiff's mental history rather than utilizing legal process to obtain protected HIPAA materials.

**COUNT 10 – ILLEGAL SEARCH AND SEIZURE – AMAZON ACCOUNT HISTORY| Fourth Amendment**

1. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2. Plaintiff asserts that CHS-1 known as J.H. engaged him on LinkedIn on November 8, 2025, at the direction of unknown agent(s).

3. Plaintiff was recommended by CHS-1 to purchase a Raspberry Pi minicomputer to setup an encrypted VPN.

4. Plaintiff did not follow through up on CHS-1's request but did note that he was not interested in hiding his location from anyone but rather that he was nervous about being hacked.

5.  Plaintiff coincidentally had purchased a Raspberry Pi from Amazon in two months earlier that was later returned.

6.  Plaintiff believes that the Government obtained his Amazon purchase history without a warrant sometime between September 8, 2025 and November 8, 2025.

## COUNT 11 – HARASSMENT, STALKING, | Title VII Civil Right Act, American with Disabilities Act, Fourth Amendment, Fourteenth Amendment

1.  Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2.  Plaintiff asserts that on November 3, 2024 an undercover agent ("UCE-2") informed Plaintiff to be careful about his weird neighbor who was selling homosexual services.

3.  UCE-2 told Plaintiff this information solely to harass him and trigger his anxiety disorder.

## COUNT 12 – FALSE IMPRISONMENT, ARREST, and ILLEGAL DETENTION | FOURTH AMENDMENT

1.  Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2.  On December 5, 2025 Plaintiff was approached by two members of Amazon Security and escorted into a room for an apparent wellness check.

3.  Plaintiff was not free to leave the moment the door closed behind him as he was questioned about an ethics complaint and then his mental state. He asked if he could step out to retrieve water and was told no.

4.  Plaintiff believes this was initiated by AMAZON INVESTIGATOR-1 ("AI-1") who falsely reported that Plaintiff had been hallucinating despite working at his desk quietly for several hours.

5.  Plaintiff was effectively seized until EMS arrived and did not determine that anything was wrong with him. At that time Plaintiff asked if he could leave and was finally told, yes.

## COUNT 13 – ILLEGAL SEARCH AND SEIZURE | FOURTH, FIFTH, AND EIGHTH AMENDMENT | Title VII Civil Rights Act

1.  Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2.  On August 13, 2025 Plaintiff rode the commuter rail train from his home in Wellesley to Boston to get to work. Upon arriving at the train station he exited and rented a public bike using a key fob.

3.  Plaintiff had his keys while he was inside of workplace as he recalled setting them down on his desk. At some point they disappeared and he later found them at the train station's lost and found.

4.  The representative said a train conductor found them on a trolley which did not make sense. Plaintiff had to use a key fob to rent a bicycle from a which he then docked at a kiosk near his office.

5.  Plaintiff asserts that his keys were taken without authorization off of his desk by an unknown defendant agent to support an FBI investigation.

6.  These actions caused emotional distress as Plaintiff was left scrambling for his keys which caused him to miss the train home.

**COUNT 14 – HARASSMENT, STALKING, | Title VII Civil Right Act, American with Disabilities Act, Fourth Amendment, Fourteenth Amendment**

1. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2. On November 9, 2025 Plaintiff was told by UCE-1 in a sarcastic tone that he would introduce him to the neighbors and that they will cross paths again maybe in the summer.

3. As Plaintiff overheard UCE-1 talking about the investigation a day and that he had been working on getting this guy (Plaintiff) for five years, he took this to be a metaphor indicating he'd eventually be arrested and then know that multiple agents live on the property.

4. Plaintiff believes this deceptive comment was meant to negatively impact his mental health in the event he was indicted on falsified charges.

**COUNT 15 – OBSTRUCTION OF JUSTICE / PLANTING EVIDENCE | Title VII Civil Rights Act, American with Disabilities Act, Fourth, Fifth, Sixth, and Fourteenth Amendment**

1. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2. Plaintiff asserts that the Government made an effort to plant evidence on Plaintiff's cloud account ("Google Account") by linking clacroix@gmail.com to explicit adult groups on August 14, 2025.

3. Plaintiff believes that Defendants engaged in a sophisticated conspiracy to plant evidence in his Google Account which would have been found pursuant to a search warrant if the Government obtained one after August 14, 2025.

4. These malicious actions were intended to generate negative character evidence that would have deprived Plaintiff of his right to a fair and impartial trial

**COUNT 16 – OBSTRUCTION OF JUSTICE / PLANTING EVIDENCE | Title VII Civil Right Act, American with Disabilities Act, Fourth, Fifth, Sixth, and Fourteenth Amendment**

1. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2. Plaintiff asserts that Defendants exploited Plaintiff's kindness by having informants lead him into making incriminating statements to paint him as a disgruntled Amazon employee.

3. Plaintiff is referring to leading conversations made by A.T. who worked beside him.

4. A.T. was terminated days before Plaintiff returned to work from a personal leave of absence.

**COUNT 17 – OBSTRUCTION OF JUSTICE / PLANTING EVIDENCE | Title VII Civil Right Act, American with Disabilities Act, Fourth, Fifth, Sixth, and Fourteenth Amendment**

1. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2. On August 13, 2025 a man known as T.C., a Business Analyst at Amazon, convinced Plaintiff to open an excel file that harbored a malicious script. This script caused Plaintiff's work account to connect into a labor database that he had no right to access.

3. Plaintiff states that the Defendants' risky choice to involve Amazon colleagues and have them generate evidence put him in an untenable situation that cannot be rewound.

4. Less than a month later Plaintiff also found malware on his work laptop which may have been used to commit crimes from his machine.

**COUNT 18 – ILLEGAL SEARCH AND SEIZURE due to UNAUTHORIZED ENTRY INTO HOME | FOURTH AMENDMENT**

1. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2. Plaintiff asserts that Defendants took an opportunity to obstruct justice when he and his family attended his wife's naturalization ceremony.

3. UCE-4 attended the ceremony to monitor Plaintiff while Defendants advanced a plan to make unauthorized entry into Plaintiff's home and likely tamper with his devices which were all out of his control.

**COUNT 19 – ILLEGAL SEARCH AND SEIZURE due to UNAUTHORIZED ENTRY INTO HOME | FOURTH AMENDMENT**

1. Plaintiff re-alleges the allegations in paragraphs 1 - 157.

2. Plaintiff asserts that the Government made unauthorized entry into his home located at 680 Worcester Street, Wellesley MA on July 25, 2025 during the execution of a fire alarm.

## IV.    Relief

- **Plaintiff requests a temporary restraining order against Defendants requiring them to immediately cease any form of physical surveillance.**

- **Plaintiff requests an additional restraint on Defendants' long term use of aerial surveillance. Plaintiff is not engaged in crime, not violent, and not a flight risk. There is no investigatory justification unless Defendants are or have manufactured evidence.**

- **Plaintiff at a later time prays for a preliminary injunction barring the government from repeating similar surveillance practices for the remainder of the Plaintiff's life unless Plaintiff is determined to no longer to be prone to anxiety, depression, and psychosis.**

- **Finally, Plaintiff demands a jury seeking $1,000,000.00 due to the emotional distress, damage done to his mental health and reputation, and harassing behavior. Plaintiff was pushed into a psychotic episode which contributed to the loss of his apartment, children, job, wages, and wife. Plaintiff was also misdiagnosed by doctors thanks to actions taken by the Government.**

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Date of signing: 12/24/2025

Cameron LaCroix